| | | |
|---|---|---|
| STEPHANIE M. FERRANTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00211-JAW |
| | ) | |
| MAS MEDICAL STAFFING, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Stephanie M. Ferrante brought this lawsuit under the Maine Human Rights Act (MHRA) alleging that MAS Medical Staffing (MAS), her former employer, wrongfully discriminated against her on the basis of sex, wrongfully retaliated against her, and constructively discharged her. Having considered the much-disputed record, the Court concludes that under Federal Rule of Civil Procedure 56, there are genuine issues of material fact that require jury resolution on the retaliation but not the sex discrimination claim. The Court also concludes that constructive discharge under the MHRA does not exist as an independent theory of action and the Court grants judgment on that count.

## I. STATEMENT OF FACTS

### A. Procedural Posture

On May 20, 2013, Ms. Ferrante filed a complaint against MAS in Cumberland County Superior Court, alleging that MAS had unlawfully discriminated against her on the basis of sex, and alleging that MAS had wrongfully retaliated against and

constructively discharged her. State Ct. R. Attach. 2, *Compl.* at 2-3 (ECF No. 2-2) (*Compl.*). On June 6, 2013, MAS removed the case to this Court. *Notice of Removal* (ECF No. 1). MAS answered the complaint on June 7, 2013. *Answer* (ECF No. 5). On June 24, 2013, MAS filed a motion to stay on the ground that its pending Motion for Additional Findings / Motion to Amend before the Superior Court could resolve the entire federal case. *Motion to Stay* (ECF No. 7). On September 9, 2013, the Superior Court denied MAS's motion, and on September 17, 2013, the Magistrate Judge determined that the Motion to Stay was moot. *Report of Hr'g and Order Re: Scheduling* (ECF Nos. 20, 21).

On April 3, 2014, MAS filed a notice of intent to file a motion for summary judgment. *Notice of Intent to File Summ. J. Mot. & Need for Pre-Filing Conference* (ECF No. 31). In anticipation of a Local Rule 56(h) Conference, MAS filed a pre-conference memorandum on April 11, 2014, *Local Rule 56(h) Pre-Conference Filing Mem.* (ECF No. 35), and Ms. Ferrante responded on May 9, 2014, *Pl.'s Resp. to Def.'s Intent to File a Mot. for Summ. J.* (ECF No. 36). On May 16, 2014, the Court held a Local Rule 56(h) conference with counsel. *Local Rule 56(h) Pre-Filing Conference* (ECF No. 37).

On June 13, 2014, MAS moved for summary judgment with a supporting statement of material facts. *Def.'s Mot. for Summ. J.* (ECF No. 38) (*Def.'s Mot.*); *MAS's Statement of Material Facts Regarding Summ. J.* (ECF No. 39) (DSMF). On June 30, 2014, Ms. Ferrante responded to MAS's motion, filed a statement opposing MAS's statement of material facts, and filed her own statement of material facts. *Pl.'s*

*Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 45) (*Pl.'s Opp'n*); *Pl.'s Opp'n to Def.'s Statement of Material Facts* (ECF No. 42) (PRDSMF); *Pl.'s Statement of Material Facts* (ECF No. 43) (PSAMF). On July 10, 2014, MAS filed a reply to Ms. Ferrante's opposition and to her statement of material facts. *Def.'s Reply to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 49) (*Def.'s Reply*); *Def.'s Resp. to Pl.'s Statement of Material Facts* (ECF No. 50) (DRPSAMF).

### B. Summary Judgment Facts[1]

#### 1. Ms. Ferrante's Employment History with MAS

MAS, founded in 2002, is a company that provides staff relief to health care facilities in Maine, New Hampshire, and Rhode Island. DSMF ¶¶ 1, 3; PRDSMF ¶¶ 1, 3. There are two divisions in the Westbrook, Maine MAS office: Elder Services and Children's Services. DSMF ¶ 13; PRDSMF ¶ 13.

MAS has a sexual harassment policy that provides in part:

> MAS Medical Staffing and Home Care of Maine wants to ensure that its employees can work without being subjected to sexual harassment. Sexual harassment is unwanted attention of a sexual nature, often with an underlying element of threat or coercion. It can also include sexist remarks or verbal abuse directed towards a person or a gender.

DSMF ¶ 5; PRDSMF ¶ 5. MAS has a practice of educating employees about its sexual harassment policy. DSMF ¶ 8; PRDSMF ¶ 8. There are posters on employee's rights and responsibilities in MAS's Westbrook office.[2] DSMF ¶12; PRDSMF ¶12. Although

---

[1]    Keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Ms. Ferrante's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 17 (1st Cir. 2002).

[2]    Ms. Ferrante denies the part of MAS's paragraph 12 which stated: "[D]uring orientation, new employees receive and are advised regarding MAS's sexual harassment policy and other policies and procedures." DSMF ¶ 12; PRDSMF ¶ 12.

Ms. Ferrante began working for MAS on May 9, 2011, she received the company's sexual harassment policy on July 20, 2011. DSMF ¶¶ 6, 9; PRDSMF ¶¶ 6, 9.

MAS hired Ms. Ferrante as a scheduling coordinator in its Elder Services division at the Westbrook office. DSMF ¶¶ 6, 7; PRDSMF ¶¶ 6, 7. Ms. Ferrante's supervisor in Elder Services was Pamela Wing. *Def.'s Mot.* at 1. Ms. Ferrante believed she "thrived" as a scheduler. DSMF ¶ 10, PRDSMF ¶ 10. During her time as an employee at MAS, she was never disciplined for poor job performance or put on a performance improvement plan. DSMF ¶ 108; PRDSMF ¶ 108. Ms. Ferrante documented her tasks, experiences, and feelings from July to December of 2011 including removal of job duties and feelings of ostracism, in written Memoranda for Records (MFR); the memoranda are not a complete list of those experiences, however.[3] DSMF ¶ 100; PRDSMF ¶ 100.

The atmosphere in Elder Services was different from Children Services, and Ms. Ferrante described Elder Services as "chaotic". DSMF ¶13; PRDSMF ¶ 13. Ms. Ferrante would typically eat lunch at her desk in her cubicle, but would eat lunch in

Ms. Allyson Joy is the highest level Human Resource employee in Maine for MAS and she served in that capacity during Ms. Ferrante's employment. DSMF ¶ 4; PRDSMF ¶ 4. To support paragraph 12, MAS cites Ms. Joy's deposition testimony that her responsibilities included reviewing MAS's hostile work environment policy during orientation. *See* DSMF Attach. 1, *Dep. of Allyson C. Joy,* 26:9-14 (ECF No. 39-1) (*Joy Dep.*).

Citing her July 17, 2011 letter to the EEOC, where Ms. Ferrante demanded that MAS "provide every employee with a copy of the [harassment and retaliation] policy and procedure during new hire orientation", she denies "that during orientation new employees were advised regarding MAS's sexual harassment policy." PRDSMF ¶ 12 (citing *Ferrante Dep.* Ex. 11). Viewing the facts in the light most favorable to Ms. Ferrante, the Court omits the disputed portion of MAS's paragraph 12.

[3] MAS paragraph 100 states, "Ms. Ferrante documented her perceived ostracism and removal of job duties in Memorandum of Records." DSMF ¶ 100. Ms. Ferrante denies that the MFRs are a complete list of the loss of her duties. PRDSMF ¶ 100. Having reviewed the record, the Court concludes that the MFRs describe more than feelings of ostracism and job duties, and has expanded the description of the MFRs to provide additional context. Additionally, the Court accepts Ms. Ferrante's qualification.

the conference room if Ken Johnson, co-founder and vice president of MAS, visited the office. DSMF ¶¶ 1, 2, 11; PRDSMF ¶¶ 1, 2, 11.

On either June 28 or 29, 2011, Ms. Ferrante met with Ms. Joy of Human Resources to discuss her concerns about the conduct of her supervisor, Ms. Wing. DSMF ¶ 34, PRDSMF ¶ 34. On July 5, 2011, Ms. Ferrante met with Ms. Joy about the possibility of transferring. DSMF ¶ 45; PRDSMF ¶ 45. On July 6, 2011, MAS temporarily transferred Ms. Ferrante for thirty days to the Children's Services division where she would report to Kim Proulx.[4] DSMF ¶¶ 47, 49; PRDSMF ¶¶ 47, 49. On July 14, 2011, Ms. Ferrante was hired for the Director's Assistant position at a higher rate of pay; this position reported to Ms. Proulx.[5] DSMF ¶¶ 52, 59; PRDSMF ¶¶ 52, 59. Her office remained in the same place after the transition to her new position. DSMF ¶ 109; PRDSMF ¶ 109.

On December 2, 2011, Ms. Ferrante submitted a request for time off from 2:45 p.m. until the end of the day, citing "workplace harassment", and on December 5,

---

[4]     MAS's paragraph 47 states:

> After this meeting, MAS temporarily "transferred [Ms. Ferrante] immediately" and let her "resume work on the 6th [of July] under Kim."

DSMF ¶ 47. In her response, Ms. Ferrante denied that "MAS permanently transferred Ms. Ferrante." PRDSMF ¶ 47. The Court rejects Ms. Ferrante's denial because MAS's paragraph 47 does not assert that the transfer was permanent. The Court deems MAS's paragraph 47 admitted.

[5]     Citing Ms. Ferrante's email to Ms. Proulx dated July 7, 2011, MAS states that Ms. Ferrante applied for the Director's Assistant position on July 7, 2011. DSMF ¶ 51. Ms. Ferrante emphatically denies this statement, citing a lack of record support for the statement. PRDSMF ¶ 51 ("The cited evidence does not in any way support that Ms. Ferrante applied for the position on July 7, 2011"). MAS provided no ECF citation for the email it asserts contains Ms. Ferrante's application for the Director's Assistant position. Viewing the record in the light most favorable to Ms. Ferrante, the Court accepts Ms. Ferrante's denial that July 7, 2011 was the date of Ms. Ferrante's application. The distinction appears to be of little consequence as Ms. Ferrante later admitted that she was awarded the position of Director's Assistant on July 14, 2011. DSMF ¶ 59; PRDSMF ¶ 59.

2011, Ms. Ferrante sent a document to Ms. Proulx stating, "This letter serves as official notification of my forced resignation because of the harassment and retaliation which I have endured and continue to endure without any sign of abatement." DSMF ¶¶ 110, 111; PRDSMF ¶¶ 110, 111.

## 2. The Content and Frequency of Ms. Ferrante's Supervisor's Remarks Either to Ms. Ferrante or in Ms. Ferrante's Presence

Beginning when Ms. Ferrante joined MAS and continuing on an almost-daily basis until at least July 17, 2011, Ms. Ferrante's supervisor, Ms. Wing, made sexually inappropriate comments at work.[6] PSAMF ¶¶ 1-3, 34. Ms. Wing was the only MAS employee who made comments that Ms. Ferrante characterizes as sexually inappropriate. DSMF ¶ 14; PRDSMF ¶ 14. Shortly after Ms. Ferrante began working at MAS, Ms. Wing mentioned that Ms. Ferrante had to be Italian because Ms. Ferrante had "dick-sucking lips." DSMF ¶ 15; PRDSMF ¶ 15. On June 1, 2011, Ms. Wing stated that she had to leave early to go "home to give her husband a nooner."[7]

---

[6]   Ms. Ferrante states that Ms. Wing continually made sexually inappropriate comments "from the outset of Ms. Ferrante's employment" at least until July 17, 2011. PSAMF ¶¶ 1, 34. Ms. Ferrante testified that "conversations of a sexual nature occurred pretty much since I started at MAS", PRDSMF Attach. 3, *Ferrante Dep.* at 69:14-15 (ECF No. 42-3) (*Ferrante Dep. 3*), and later testified that the only person making comments she described as "inappropriate" was Ms. Wing. *Ferrante Dep. 3* at 70:18-21. MAS contends that the cited source does not support Ms. Ferrante's statement that Ms. Wing continually made inappropriate sexual comments in the workplace from the outset of Ms. Ferrante's employment, and qualifies the statement by contending that Ms. Ferrante could only remember a "handful" of specific instances when asked about the incidents. DRPSAMF ¶¶ 1-3, 34. The Court finds record support for the statements that the conduct occurred "nearly every day", PRDSMF Attach. 4, *Ferrante Dep.* at 112:21-25 (ECF No. 42-4) (*Ferrante Dep. 4*), until at least July 17, 2011, and includes Ms. Ferrante's statement. The Court rejects MAS's qualified response.
[7]   The parties disagree about whether Ms. Wing "would say" that she had to leave early or whether she said it on one occasion. PSAMF ¶ 5; DRPSAMF ¶ 5. The word "would" indicates that Ms. Wing said this more than once. Because the record supports the statement that Ms. Wing said she had to leave early to give her husband "a nooner" on one specific occasion, the Court has modified Ms. Ferrante's statement accordingly.

DSMF ¶ 16; PRDSMF ¶ 16; PSAMF ¶ 5; DRPSAMF ¶ 5. In response, Ms. Ferrante was disgusted and expressed her shock; she asked Ms. Wing if she was kidding, and Ms. Wing responded, "you think I am kidding?" [8] DSMF ¶ 17, PRDSMF ¶ 17. This made Ms. Ferrante feel "disgusted" and "totally uncomfortable." DSMF ¶ 17; PRDSMF ¶ 17. Ms. Ferrante was able to return to work and get her work done that day, however. DSMF ¶ 18; PRDSMF ¶ 18.

On June 2, 2011, Ms. Wing was standing with another employee behind Ms. Ferrante's cubicle and mentioned going home and giving her husband "another episode like yesterday." DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 7; DRPSAMF ¶ 7. In response, Ms. Ferrante said to Ms. Wing, "please don't talk like that around me . . . I don't want you to talk like that in front of me." DSMF ¶ 19; PRDSMF ¶ 19; PSAMF ¶ 8; DRPSAMF ¶ 8. Again, Ms. Ferrante was able to return to work and complete her work that afternoon. DSMF ¶ 20; PRDSMF ¶ 20.

Ms. Wing talked about being intimate with her husband on more occasions than those Ms. Ferrante documented, and only made the sexual comments in the presence of women; almost all of the employees at the Westbrook office were women, however.[9] PSAMF ¶¶ 4, 18; DRPSAMF ¶ 4, 18. On one occasion, Ms. Ferrante asked

---

[8]     Ms. Ferrante states that she "expressed her disgust" to Ms. Wing, which MAS objects to on the basis that "are you kidding" does not express disgust. PSAMF ¶ 6; DRPSAMF ¶6. Ms. Ferrante testified that she stared at Ms. Wing and felt disgusted, and that her face had a shocked expression on it. *Ferrante Dep.* 4 at 78:8-13. Although the Court does not understand why the difference is so important, the Court modified Plaintiff's paragraph 6 from "expressed her disgust" to "expressed her shock."

[9]     Ms. Ferrante states that, on a daily basis, Ms. Wing talked about being intimate with her husband. PSAMF ¶ 4. She cites her deposition in which she testified that Ms. Wing "would talk about being intimate with her husband on more than the occasions" Ms. Ferrante documented. *Ferrante Dep.* 4 at 114:12-14. MAS denies this, asserting that the underlying record does not support the "daily

Ms. Wing to "stop the inappropriateness". PSAMF ¶16; DRPSAMF ¶ 16. Ms. Wing

continued to make comments while standing behind Ms. Ferrante's desk, which Ms.

Ferrante felt was a direct response to her request for the behavior to stop.[10] PSAMF

¶17; DRPSAMF ¶ 17.[11]

On June 3, 2011, Ms. Wing shared with co-workers that her husband is

nicknamed "Scuba Steve" because he suggested that a caregiver "put on some scuba

gear and dive down with a scrub brush in a large woman's fat rolls and clean her

basis" statement. DRPSAMF ¶ 4. Even viewing the evidence in the light most favorable to Ms. Ferrante, the Court agrees with MAS and has modified the assertion to comport with the record.

Additionally, Ms. Ferrante, in her sworn affidavit, stated that Ms. Wing made sexual comments, as described in her deposition, "only in the presence of women." PRDSMF Attach. 9, *Ferrante Aff.* at 1 (ECF No. 42-9) (*Ferrante Aff.*). MAS points out that Ms. Ferrante testified that Ms. Wing would make comments "to everyone", but states that the Westbrook office was staffed almost entirely by women, and that Ms. Wing supervised only women. DRPSAMF ¶18. The Court includes MAS's qualification because it is true and because it provides context for Ms. Ferrante's assertion.

[10] MAS states that "[i]t was Ms. Ferrante's speculation that Ms. Wing would make comments behind her desk on purpose. Ms. Ferrante testified that Wing did not say she was making inappropriate comments behind her desk on purpose." DRPSAMF ¶ 17. The Court has modified Ms. Ferrante's assertion to reflect that it represents her impression of Ms. Wing's behavior.

[11] Ms. Ferrante states that, on an unspecified date, Ms. Wing grabbed Muriel Blanc's breasts in front of four coworkers and joked that she – Ms. Blanc – could file a sexual harassment suit. PSAMF ¶ 19. MAS denied the statement on the ground that it is not material and there is no evidence that Ms. Ferrante knew about this alleged incident. DRPSAMF ¶ 19. In support of this paragraph, Ms. Ferrante cites Ms. Blanc's Maine Human Rights Commission (MHRC) complaint. PSAMF ¶ 19 (citing PRDSMF Attach. 13, *Blanc MHRC Compl.* ¶ 4 (ECF No. 42-13) (*Blanc. MHRC Compl.*)).

Paragraph four of Ms. Blanc's MHRC complaint states that on September 16th, 2011, she told Ms. Ferrante that she thought it was wrong and illegal for MAS to harass her. *Blanc MHRC Compl.* ¶ 4. The paragraph then says: "I also stated that just prior to Pam's departure, Pam went to grab my breasts in front of four coworkers, and she joked around that I could file a sexual harassment suit." *Id.*

First, Ms. Ferrante's paragraph incorrectly states that Ms. Wing actually grabbed Ms. Blanc's breasts; the paragraph states that Ms. Wing "went to grab my breasts." Next, MAS's objection—that Ms. Ferrante did not know about this incident—is frivolous because paragraph four of Ms. Blanc's MHRC complaint states that Ms. Blanc told Ms. Ferrante about the incident. Third, based on Ms. Blanc's MHRC complaint, the Court is unclear why MAS denied the allegation, as opposed to issuing a qualified response, admitting the allegation under Local Rule 56(g) for purposes of the motion for summary judgment only. Finally, in the context of this motion, the Court does not know what the relevance of Ms. Wing's conduct toward Ms. Blanc would be in Ms. Ferrante's case against MAS and the Court has not included the incident.

'cooter.'"[12]  DSMF ¶¶ 21, 22; PRDSMF ¶¶ 21, 22.  In front of other employees, Ms.

Wing asked Ms. Ferrante for the Italian translation of "vagina" and when Ms.

Ferrante did not respond, Ms. Wing coaxed her for an answer. [13]  DSMF ¶¶ 23, 24;

PRDSMF ¶¶ 23, 24; PSAMF ¶ 12; DRPSAMF ¶ 12.  In response, Ms. Ferrante put

her head on her desk and said, "this is so inappropriate . . . I need to work."  PSAMF

¶ 13; DRPSAMF ¶ 13.

In 2011, only two men worked at the MAS Westbrook office and as of July 8,

2011, only one man, Duane Manning, worked at that office.  DSMF ¶¶ 25, 26;

PRDSMF ¶¶ 25, 26.  Mr. Manning's office was on the opposite end of the office from

where Ms. Ferrante, Ms. Wing, and Ms. Proulx worked.  DSMF ¶ 27; PRDSMF ¶ 27.

Male employees were "few and far between", but Ms. Wing would sometimes comment

on their attractiveness.  DSMF ¶ 28; PRDSMF ¶ 28; PSAMF ¶ 14; DRPSAMF ¶ 14.

At one point she said that one of the field employees was "hot" and that if she had

---

[12]    The parties disagree about whether Ms. Wing "would" describe why her husband was nicknamed "Scuba Steve" or whether she said it on one occasion. PSAMF ¶ 9; DRPSAMF ¶ 9. Because the record supports the statement that Ms. Wing said this only once, the Court accepts MAS's clarification.
        The parties also disagree about whether Ms. Wing would "talk about the personal sex lives of others". PSAMF ¶ 10; DRPSAMF ¶ 10. The Court reviewed the record cited by Ms. Ferrante and found no support for the assertion that Ms. Wing discussed other people's sexual lives and the Court has not included this assertion.

[13]    Ms. Ferrante's paragraph 12 asserts that "Ms. Wing pestered Ms. Ferrante as to whether she knew the Italian word for 'vagina'". PSAMF ¶ 12. MAS admitted only that "on one occasion" Ms. Wing asked Ms. Ferrante if she knew the Italian word for vagina. DRPSAMF ¶12.
        Ms. Ferrante's June 3, 2011 MFR states that Ms. Wing "turned to me and asked me what the word for vagina is in Italian I am guessing because I am of Italian background. She was coaxing me come on Steph I know you know what the word is you must watch jersey shore." DSMF Attach. 1, *June 3, 2011 Mem. for Record*, PageID # 267 (ECF No. 40-1) (*June 3 MFR*). The Court amended Ms. Ferrante's paragraph 12 to use the word "coaxed" instead of "pestered." With this change, the Court deems Plaintiff's paragraph 12 admitted.

some baby oil she could "teach him a thing or two."  DSMF ¶ 29; PRDSMF ¶ 29; PSAMF ¶ 15; DRPSAMF ¶ 15.

On June 17, 2011, Ms. Ferrante went out after work to a bar with co-workers.[14] DSMF ¶ 30; PRDSMF ¶ 30.  At the bar, Ms. Wing began discussing how she and her husband watch pornography and learned that "some women can 'squirt' when they are having an orgasm."[15]  DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 11; DRPSAMF ¶ 11. Ms. Ferrante's coworkers discussed this and said they would go home to try it with their respective partners; this made Ms. Ferrante uncomfortable.  DSMF ¶ 32; PRDSMF ¶ 32.  This was the final sexually inappropriate incident that Ms. Ferrante documented and can remember, but Ms. Wing's sexual comments continued after June 17, 2011 "nearly every day."[16]  DSMF ¶ 33; PRDSMF ¶ 33.

### 3.    Ms. Ferrante Reports Issues to MAS Human Resources

---

[14]    Ms. Ferrante qualifies this statement by saying that she did not go to the bar to socialize; rather, she went because the co-worker who gave her rides to and from work wanted to go to the bar. PRDSMF ¶ 30.  The Local Rules require that if the non-movant desires to place additional facts into the summary judgment record, she shall do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).

[15]    The parties disagree about whether Ms. Wing "would describe" watching pornography with her husband, as Ms. Ferrante contends, or whether Ms. Wing discussed it on one occasion.  PSAMF ¶ 11; DRPSAMF ¶ 11.  The word "would" indicates that Ms. Wing said this more than once.  Because the record only supports the statement that Ms. Wing discussed watching pornography with her husband once, the Court modified Ms. Ferrante's statement accordingly.

[16]    MAS states that June 17, 2011 is the last incident that Ms. Ferrante can remember.  DSMF ¶ 33.  Ms. Ferrante denies that this is the last incident that she can remember.  PRDSMF ¶ 33.  She points to her deposition testimony: "So as of July 17, 2011, was there any further behavior by Ms. Wing of a sexual nature that had happened since June 17? Yes I - - Pam's conversations of inappropriate behavior happened nearly every single day. And just because I didn't document it every single day doesn't mean it didn't take place. I mean she would . . . it was constant. It was every day."  *Ferrante Dep. 4* at 112:18-25.  Even viewing the evidence in the light most favorable to Ms. Ferrante, the Court concludes that Ms. Wing continued to make sexually inappropriate comments nearly every day after June 17, 2011, but does not find record support for Ms. Ferrante's qualification that she remembers sexually inappropriate conduct that occurred after June 17, 2011.

On either June 28 or June 29, 2011, Ms. Ferrante discussed concerns she had regarding her supervisor with Ms. Allyson Joy, the director of Human Resources of MAS. DSMF ¶ 34; PRDSMF ¶ 34. Ms. Ferrante discussed the sexual nature of Ms. Wing's comments.[17] Ms. Joy encouraged Ms. Ferrante to put her concerns in writing; after their meeting, Ms. Joy called Mr. Johnson regarding Ms. Ferrante's complaint. DSMF ¶¶ 35, 36; PRDSMF ¶¶ 35, 36; PSAMF ¶¶ 25, 28; DRPSAMF ¶¶ 25, 28.

After Ms. Ferrante emerged from her meeting with Ms. Joy, she was met with "a lot of glares" from some of the employees in Elder Services, and Ms. Wing began to "badger" her with questions about why she had spoken with Human Resources.

---

[17] The parties disagree about whether Ms. Ferrante discussed the sexual nature of the comments with Ms. Joy during the June 28 or June 29 meeting. *See* DSMF ¶¶ 39, 40; PRDSMF ¶¶ 39, 40; PSAMF ¶¶ 20, 21; DRPSAMF ¶¶ 20, 21. MAS asserts that Ms. Ferrante "did not discuss the sexual nature of the comments with Ms. Joy." DSMF ¶ 39. MAS cites different portions of Ms. Ferrante's deposition, including one in which Ms. Ferrante testified to what she included in her July 1, 2011 letter to Ms. Joy. DSMF ¶¶ 39, 40 (citing *Ferrante Dep. 4* at 91:9-92:18; 100:14-101:9). In that portion of her testimony, Ms. Ferrante states that the letter was "consistent with" her conversation with Ms. Joy, that it "summarize[d] the issues that [she] spoke to Ms. Joy about", and that it was "intended to be a complete report of the issues that [she] had concerning [her] supervisor."

By contrast, Ms. Ferrante "den[ies] [she] did not discuss the sexual nature of the comments." PRDSMF ¶ 39. Although she admits that she "did not use the term 'sexual comments'", she asserts that she specifically wrote that the conversations were inappropriate and of the nature that "anyone would deem inappropriate during work hours." PRDSMF ¶ 39. Furthermore, she states that she "told Ms. Joy of the sexual comments." PSAMF ¶ 21. In her deposition, Ms. Ferrante testified:

> Q. All right. Ms. Ferrante, I would like to resume our discussion at the end of June 2011. You were discussing some incidents that you had involving Ms. Wing and issues with her making comments of a sexual nature that you found inappropriate. At some point you brought your concerns to someone at MAS in a supervisory position?
> A. Yes.
> Q. I discussed my issues with Pam [Wing] herself and I also went to HR; Allyson Joy.
> Q. So you talked to Allyson Joy. And that was - - when did you first talk to Ms. Joy?
> A. Either June 28th or June 29th.
> Q. And what did you tell her?
> A. Many things about my work environment.

*Ferrante Dep.* 4 at 90:13-22.

Viewing the evidence in the light most favorable to Ms. Ferrante, the Court finds record support for the assertion that she told Ms. Joy about the sexual nature of Ms. Wing's comments during their June 28 or 29 meeting.

DSMF ¶ 41; PRDSMF ¶ 41; PSAMF ¶ 26; DRPSAMF ¶ 26.  Ms. Ferrante found this "pretty intimidating."  PSAMF ¶ 26; DRPSAMF ¶ 26.  Ms. Ferrante felt ostracized by some of her co-workers and Ms. Wing, and felt that her co-workers stopped being as helpful, especially when Ms. Wing was nearby.[18]  DSMF ¶ 42; PRDSMF ¶ 42; PSAMF ¶ 27; DRPSAMF ¶ 27.  On June 29, 2011, which was either the same day or the day after Ms. Ferrante's meeting with Ms. Joy, Ms. Wing brought Ms. Ferrante into her office and told Ms. Ferrante that she was doing her job incorrectly.  DSMF ¶ 43; PRDSMF ¶ 43.[19]

After the June 28 or June 29 meeting with Ms. Joy, Ms. Ferrante summarized her concerns in a letter dated July 1, 2011 addressed to Ms. Joy.[20]  DSMF ¶ 37;

---

[18]    Ms. Ferrante states that, following her meeting with Ms. Joy, she "was ostracized by some co-workers, especially with Ms. Wing present."  PSAMF ¶ 27.  MAS admits that this was how Ms. Ferrante felt, but qualifies the statement by saying that Ms. Ferrante felt ostracized between June 28, 2011 and July 1, 2011.  DRPSAMF ¶ 27.  Because Ms. Ferrante provided other record evidence of continued feelings of ostracism after July 1, 2011, the Court rejects MAS's qualification.

[19]    In its paragraph 44, MAS asserts that "Mr. Johnson spoke with Ms. Ferrante by telephone about the issues Ms. Ferrante was having, including the chaotic, loud, and negative environment in Elder Services."  DSMF ¶ 44.  Ms. Ferrante denied MAS's paragraph 44, saying that "they spoke about Ms. Ferrante's allegations against Ms. Wing."  PRDSMF ¶ 44.  As the Court is required to view conflicting evidence in the light most favorable to Ms. Ferrante, the Court has not included MAS's paragraph 44.

[20]    MAS contends that the July 1, 2011 letter "served as a complete report of the issues [Ms. Ferrante] had concerning Ms. Wing."  DSMF ¶ 38; DRPSAMF ¶ 22.  In support of its contention, MAS cites Ms. Ferrante's deposition:

> Q. Was your letter of July 1 intended to be a complete report of the issues that you had concerning your supervisor, Pam Wing?
> A. Yes.
> Q: Was that a yes?
> A. Yes.

*Ferrante Dep. 3* at 92:12-17.  Ms. Ferrante denies MAS's statement, maintaining that the letter only "summarized the issues she spoke to Ms. Joy about on June 28."  PRDSMF ¶ 38.  In support of her assertion, she cites her deposition:

> Q. So this is your letter marked as Exhibit Number 9 dated July 1, 2011 to Allyson Joy?
> A. It is, yes.

PRDSMF ¶¶ 37, 38; PSAMF ¶ 22; DRPSAMF ¶ 22. The letter does not expressly discuss the sexual nature of Ms. Wing's comments, but alludes to her "inappropriate" conversation.[21] DSMF ¶ 39; PRDSMF ¶ 39.

---

> Q. And does this summarize the issues that you spoke to Ms. Joy about on June 28?
> A. Yes.

*Ferrante Dep. 4* at 91:9-14. Because Ms. Ferrante provided record support for her position, and because "a complete report of the issues" could reasonably be understood as a "summary" and not an exhaustive list of every instance of inappropriate conduct, and because the Court views all facts in the light most favorable to Ms. Ferrante, the Court accepts Ms. Ferrante's qualification.

[21]     MAS asserts that the letter "does not discuss the sexual nature of the comments." DSMF ¶ 39. Ms. Ferrante denies that she did not discuss the sexual nature of the comments in her letter. PRDSMF ¶ 39. She cites her deposition:

> Q. In your letter dated July 1, 2011, can you tell me in here where you refer to the sexual incidents that you described in Deposition Exhibit Number 8 or any other incident involving sexually inappropriate conduct by Ms. Wing?
> A. I didn't get into the specifics of the - - of Pam's - - the nature of the sexual conversations that happened all of the time. I just mentioned that inappropriate conversations take place during work hours. I didn't get into that. I didn't feel comfortable discussing those kinds of things. I'm still uncomfortable talking about that.
> Q. So you didn't put it in the letter.
> A. No, I didn't put any specifics in the letter. I just wrote on more than one occasion conversations were held that anyone would deem inappropriate during work hours and even after hours for that matter. And it makes - - that is what I said regarding those.
> Q. And that's consistent with what you told Ms. Joy during your meeting on June 28.
> A. Yes. I did not specify. I didn't feel comfortable.

*Ferrante Dep. 4* at 100:15 – 101:9. To support its assertion that Ms. Ferrante's letter did not discuss the sexual nature of the comments, MAS cites both Ms. Ferrante's deposition testimony – almost identical to the section cited by Ms. Ferrante – and the actual July 1, 2011 letter itself. In that letter, in relevant part, Ms. Ferrante wrote to Ms. Joy:

> I [ ] feel I can no longer accomplish my assignments with the thought and care they require and deserve, due to my chaotic, hostile and threatening work environment. These behaviors are escalating and I fear for my position at MAS. . . .The vast majority of the conversations are in no way work related. On more than one occasion conversations were held that anyone would deem inappropriate during work hours, or even after hours for that matter. It makes it difficult to speak with staff and clients on the phone. Once, it was so loud in the office the client could actually hear what the staff in the office was saying. This, in my opinion is totally unprofessional.

*Ferrante Dep. Ex. 9* at 1; *see also* PSAMF ¶ 23, DRPSAMF ¶ 23. The language of the letter itself reveals no express references to comments of a sexual nature. Any reference to sexually-based comments could be implied, however, if Ms. Ferrante had mentioned those types of comments to Ms. Joy in the meeting that preceded the letter. In that case, the sexual comments could be the "inappropriate" conversations discussed in the letter. Viewing the facts in the light most favorable to

### 4. Ms. Ferrante's Transfer and MAS's Initial Internal Investigation

On July 5, 2011, Ms. Ferrante met with Ms. Joy and Ms. Proulx regarding the letter and the possibility of transferring.[22] DSMF ¶ 45; PRDSMF ¶ 45. Following the meeting, MAS temporarily transferred Ms. Ferrante for thirty days to a position working for Ms. Proulx, to begin the next day. DSMF ¶¶ 47-49; PRDSMF ¶¶ 47-49. On July 6, 2011, Ms. Ferrante's work location was moved to share Ms. Proulx's office. DSMF ¶ 50; PRDSMF ¶ 50.

### 5. Ms. Ferrante's Meeting with MAS's Vice President

On July 8, 2011, Mr. Johnson met with Ms. Ferrante, and Mr. Johnson "apologized for [Ms. Wing's] behavior and said action would be taken and thanked [Ms. Ferrante] for bringing it forward to him and the company would be better for it."[23] DSMF ¶¶ 54, 55; PRDSMF ¶¶ 54, 55. Ms. Ferrante told him that she "had

---

Ms. Ferrante, the Court accepts her contention that her allusion to inappropriate conversations was a reference to Ms. Wing's sexual comments.

[22] MAS asserts that Ms. Proulx and Ms. Joy "remained unaware of the sexual nature of Ms. Ferrante's complaint." DSMF ¶ 46. Ms. Ferrante maintains, however, that "Ms. Ferrante specifically testified that on either June 28 or June 29 she brought Ms. Wing's comments of a sexual nature to the attention of Ms. Joy." PRDSMF ¶ 46; PSAMF ¶ 21. Viewing the evidence in the light most favorable to Ms. Ferrante, the Court finds that Ms. Ferrante did tell Ms. Joy about the sexual nature of Ms. Wings comments, and the Court does not accept MAS's assertion that Ms. Proulx and Ms. Joy remained unaware of the sexual nature of Ms. Ferrante's complaint.

[23] There is some inconsistency regarding the date and content of the in-person meeting between Ms. Ferrante and Mr. Johnson. Both parties state that the two talked on the telephone after Ms. Ferrante first reported the incidents to Ms. Joy, but neither is clear on the date of that conversation. Also, neither is clear on the amount of time the conversation lasted. See DRPSAMF ¶ 29; PSAMF ¶ 29. Next, the parties agree that Ms. Ferrante and Mr. Johnson spoke again after Ms. Ferrante was transferred to work for Ms. Proulx but before she began working as a Director's Assistant, but they disagree about the subject of the meeting. MAS states that this second meeting happened on July 8, 2011, and that the subject of the meeting was Ms. Ferrante's transition into the new position. DSMF ¶ 54. Ms. Ferrante denies that the subject of the meeting was her transition, and states that the content of the conversation was the same discussed after Ms. Ferrante first reported the incidents to MAS; namely, that Mr. Johnson apologized for the behavior, thanked Ms. Ferrante for bringing it to his attention, and told her that Ms. Wing was unprofessional but had improved significantly from the previous six months. PRDSMF ¶ 54. In light of the Court's discussion in Footnote 19, *supra*, and

never seen anyone so unprofessional" and Mr. Johnson agreed with her and said that "if [Ms. Ferrante] thought [Ms. Wing] was bad now that [she] should have seen her six months ago."[24]  PSAMF ¶ 29; PRDSMF ¶ 54.  Mr. Johnson gave Ms. Ferrante his cell phone number and asked her to call him if she had any other issues.  DSMF ¶ 56; PRDSMF ¶ 56.

Mr. Johnson also met with approximately ten to twelve MAS employees on July 8, 2011 at the Westbrook office to investigate Ms. Ferrante's complaints.[25]  DSMF ¶¶ 57, 58; PRDSMF ¶¶ 57, 58; PSAMF ¶ 30; DRPSAMF ¶ 30.  According to MAS, Mr. Johnson did not ask about the sexual nature of the comments.[26]

### 6.    Ms. Ferrante Transitions to Director's Assistant Role

Ms. Ferrante interviewed for and was hired for the Director's Assistant position where she received a higher rate of pay and reported to Ms. Proulx.  DSMF ¶ 52; PRDSMF ¶ 52.  The Director's Assistant position was a newly-created role at MAS; Ms. Proulx did not previously have an assistant but the divisions at MAS were

---

viewing the evidence in the light most favorable to Ms. Ferrante, the Court finds record support for Ms. Ferrante's assertion.

[24]    MAS denies Ms. Ferrante's paragraph 29 but only appears to qualify Ms. Ferrante's statement by saying the conversation lasted twenty minutes.  The Court admits Ms. Ferrante's statement regarding the content of their conversation.

[25]    Ms. Ferrante denies "that Mr. Johnson investigated Ms. Ferrante's complaint of a sexual nature."  PRDSMF ¶ 57.  However, MAS's paragraph 57 does not identify the nature of Ms. Ferrante's complaint and Ms. Ferrante's response implicitly admits the rest of the paragraph, the Court deems MAS's paragraph 57 admitted.

[26]    Although the parties agree that Mr. Johnson did not investigate the sexual nature of the comments, they disagree as to why he did not.  MAS asserts that the reason he did not do so was that Ms. Ferrante had not notified MAS about the sexual nature of the comments.  DSMF ¶ 58 ("Mr. Johnson spoke to approximately 10 to 12 people, but did not ask about sexual comments because he was unaware that was a problem").  Ms. Ferrante says that she told Ms. Joy about the sexual nature of her complaint and that Mr. Johnson admitted that Ms. Joy had contacted him and told him about Ms. Ferrante's complaint.  PRDSMF ¶ 58.  Viewing the facts in the light most favorable to Ms. Ferrante, the Court has included the fact of the investigation, but not MAS's position as to why Mr. Johnson did not investigate the sexual nature of Ms. Ferrante's complaint.

growing and Mr. Johnson had approved the hiring of an assistant for Ms. Proulx. DSMF ¶ 53; PRDSMF ¶ 53. The job description identified thirty-one specific tasks. PSAMF ¶ 54; DRPSAMF ¶ 54. On July 14, 2011, Ms. Ferrante was officially offered the Children's Services Director's Assistant role. DSMF ¶ 59; PRDSMF ¶ 59. She accepted the position, the transition was announced by Ms. Proulx via email on July 15, 2011, and she received an official letter on July 18, 2011 that memorialized the transfer and increased pay. DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶ 53; DRPSAMF ¶ 53.

After Ms. Ferrante's transition to her new role, her former coworkers in Elder Services were not working as closely with her as they had before the transition, but her new coworkers in Children's Services were talking and working with her. DSMF ¶ 63; PRDSMF ¶ 63. Also, at some point in the middle of July 2011, while Ms. Proulx was on vacation, Ms. Wing took Ms. Proulx's company checkbook from her office to write a check for one of the employees; Ms. Ferrante was the only person that Ms. Proulx authorized to write checks.[27] DSMF ¶ 62; PRDSMF ¶ 62.

### 7. Ms. Ferrante's EEOC Charge and MAS Management Response

On July 17, 2011, Ms. Ferrante wrote a letter to the EEOC notifying the Commission of the sexually hostile work environment. DSMF ¶ 60; PRDSMF ¶ 60;

---

[27] MAS states that "[a]fter July 17, 2011, there was an incident when Ms. Proulx was on vacation and Ms. Wing wrote a check out of the company checkbook for one of the workers, but did not go through Ms. Ferrante." DSMF ¶ 62. Ms. Ferrante denies the statement on the basis that the cited evidence, her own deposition testimony, does not support the alleged fact. The Court has reviewed the cited portion of her deposition testimony, and has included MAS's statement of fact as qualified by Ms. Ferrante's testimony.

PSAMF ¶ 35; DRPSAMF ¶ 35. The submission made reference to the "enduring hostile work environment", and the "pervasive unprofessional and chaotic work environment" that caused her to "respectfully request the implementation and enforcement of an anti-harassment and retaliation policy complaint procedure as a remedy".[28] PSAMF ¶ 24; DRPSAMF ¶ 24. Ms. Ferrante's EEOC submission did not make specific reference to the sexual nature of Ms. Wing's comments.[29] DSMF ¶ 61; PRDSMF ¶ 61.

On July 26, 2011, Ms. Ferrante signed her EEOC and MHRC charge in which she alleged both discrimination based upon sex and retaliation.[30] PSAMF ¶ 36; DRPSAMF ¶ 36.

On August 9, 2011, Ms. Joy asked to talk with Ms. Ferrante in order to make sure everything was okay, because Mr. Johnson had received Ms. Ferrante's EEOC charge the previous day. DSMF ¶ 64; PRDSMF ¶ 64; PSAMF ¶ 37; DRPSAMF ¶ 37. Ms. Joy asked Ms. Ferrante why she had checked the sex discrimination box".[31]

---

[28]     Ms. Ferrante asserts that she included these statements in her July 1, 2011 letter to Ms. Joy. PSAMF ¶ 24. MAS denies this. DRPSAMF ¶ 24. The Court reviewed the July 1, 2011 letter and agrees with MAS.

[29]     Ms. Ferrante denies that the letter did not make specific reference to the sexual nature of Ms. Wing's comments, and quotes excerpts from her July 17, 2011 letter to the EEOC. PRDSMF ¶ 61. After reviewing the letter in its entirety and viewing the evidence in the light most favorable to Ms. Ferrante, the Court concludes that there was no specific mention in the July 17, 2011 letter about the sexual nature of Ms. Wing's comments and the Court declines to accept Ms. Ferrante's denial.

[30]     MAS admits that Ms. Ferrante signed her EEOC charge on July 26, 2011, and that the filing was received by the EEOC on August 1, 2011. DRPSAMF ¶ 36. However, MAS denies that the filing was sufficient to fulfill the administrative exhaustion requirements under the MHRA. DRPSAMF ¶ 36. MAS's objection is not proper. It goes to the legal significance of the EEOC charge, not to whether she in fact signed her MHRC complaint on July 26, 2011. The Court deems the statement admitted.

[31]     MAS states that "Ms. Joy asked Ms. Ferrante why she had checked the sex discrimination box as Ms. Ferrante had not mentioned anything to Ms. Joy regarding sex discrimination." DSMF ¶ 65. Ms. Ferrante explained that the consultant stated she needed to mark something so they picked the "sex" box. PRDSMF ¶ 65. In support of this statement, MAS cites Ms. Joy's deposition testimony, which discusses the August 9, 2011 meeting with Ms. Ferrante:

DSMF ¶ 65. Ms. Ferrante responded that the consultant said she needed to mark something so they picked the sex box.[32] DSMF ¶ 65; PRDSMF ¶ 65. Ms. Ferrante complained to Ms. Joy that she believed that MAS "is unwilling to acknowledge the lack of a coherent sexual harassment and retaliation policy" and that when she came to work "half of the staff in the office does not acknowledge [her] existence when [her] former supervisor Pam Wing is around", and that she "wasn't satisfied with the way Ken investigated Pam's fear and intimidation tactics." PSAMF ¶¶ 38, 39, 40; DRPSAMF ¶¶ 38, 39, 40. Ms. Ferrante indicated she had no intention of withdrawing her complaint. PSAMF ¶ 41; DRPSAMF ¶ 41.

On August 17, 2011, Ms. Joy and Ms. Proulx met with Ms. Ferrante to talk about her claim. DSMF ¶ 67; PRDSMF ¶ 67. MAS states that neither woman asked Ms. Ferrante to withdraw her charge; however, Ms. Ferrante felt like they were

> Q. What else - - were there any other reasons for the meeting?
> A. I believe I asked her because she had sent me a letter dated July 1st and that July 1st letter didn't explain anything about sex.
> Q. Okay. And so did you ask her?
> A. Uh-huh, I did.
> Q. And what did she say?
> A. She explained it to me that her consultant helping her fill out the form stated to her that she had to mark something to file it so they picked the sex box.

*Joy Dep.* at 41:23-42:8. In that meeting, MAS states, Ms. Joy indicated that she wished she had known, because she would have helped her in the process. DSMF ¶ 66.

In response, Ms. Ferrante reasserts that she told Ms. Joy about the sexual comments during their meeting of June 28th or June 29th and she denies that she had not mentioned anything to Ms. Joy about sex discrimination; she also asserts that she had given management notice of the sexual nature of her complaint through Ms. Joy. PRDSMF ¶ 66. Ms. Ferrante cites a portion of her deposition where she testified that she told Ms. Joy "many things about [her] work environment" in their meeting in late June. *Id.* Furthermore, she states, her July 1 letter specifically mentions "inappropriate" conversations. *Id.*

Given the Court's earlier conclusion that Ms. Ferrante did mention the sexual nature of the comments in the late June meeting with Ms. Joy, the Court likewise will not conclude that Ms. Joy did not know of the sexual comments when she received Ms. Ferrante's EEOC charge in August.

[32] Ms. Ferrante does not deny this statement. *See* PRDSMF ¶ 65.

pressuring her to withdraw it.[33]  DSMF ¶ 68; PRDSAMF ¶ 68; PSAMF ¶ 42; DRPSAMF ¶ 42.

Ms. Ferrante, Ms. Joy, and Ms. Proulx met again on August 18, 2011.  DSMF ¶ 69; PRDSMF ¶ 69.  Again, MAS states that Ms. Joy and Ms. Proulx did not ask Ms. Ferrante to withdraw her charge; however, they implied to Ms. Ferrante that they wanted her to withdraw it.[34]  DSMF ¶ 69; PRDSMF ¶ 69; PSAMF ¶ 43; DRPSAMF ¶

---

[33]    According to MAS, Ms. Joy and Ms. Proulx did not ask Ms. Ferrante to withdraw her EEOC charge, but Ms. Ferrante felt as though they wanted her to withdraw it.  DSMF ¶ 68; DRPSAMF ¶ 42. To support its contention, MAS cites both Ms. Ferrante's and Ms. Joy's depositions.  Ms. Ferrante testified in her deposition that:

>    They asked about the claim and they were both - - they wanted - - it seemed like they wanted information, and I didn't feel like I was really willing to talk about it. I didn't want to talk about my claim.  I felt uncomfortable.  I feel like they made me feel bad for filing the claim because they had mentioned a bunch of issues about Pam and how she had a lot of shocks to her system with her employment at MAS recently about Kim getting hired and Pam having lost control of children's services because I guess Pam had run both divisions at one time.  Even Allyson getting hired was also another shock to Pam as Pam did her own HR.  So I guess they wanted me to feel bad for Pam because of all of her - - some of her responsibilities had gotten taken away and moved around and that couldn't have been easy for her, they said.
>    And furthermore they said that it wasn't me going after Pam, that it was me going after the company and that children's services is going to get dragged through this.  I mean if anything made me feel really bad, that was probably it because I really enjoyed working with Kim and really respected what she had done and I really wanted to be a part of that growth in her division.  I almost felt that by her saying that, that it was a way to make me feel bad that, you know, after all of the work that she's done that everything is - - that she's worked for is going to get dragged through all of the EEOC and interviews and things like that.  So I mean that made me feel really bad. And that MAS was Ken's - - Ken's baby and they really made me feel that it would not be good for the company to continue with the EEO process.

PRDSMF Attach. 5, *Ferrante Dep*. at 147:17-148:21 (ECF No. 42-5) (*Ferrante Dep. 5*).  MAS also cites Ms. Joy's deposition in which she testified that there was "absolutely not" any discussion to have Ms. Ferrante withdraw her complaint and that the topic never came up.  DSMF ¶ 68 (citing *Joy Dep*. at 55:6-13)
     In response to MAS's description of the discussion, Ms. Ferrante says that she felt she was being pressured to withdraw her charge, citing her own deposition testimony.  PRDSMF ¶ 68; PSAMF ¶ 42.  Although Ms. Joy and Ms. Proulx did not expressly ask Ms. Ferrante to withdraw her claim, the Court finds that, viewing the evidence in a light most favorable to Ms. Ferrante, Ms. Ferrante felt like they pressured her to withdraw her claim.

[34]    There are three accounts of the meeting: Ms. Ferrante's, Ms. Joy's, and Ms. Proulx's.  Ms. Ferrante testified in her deposition that she thought "their statements expressed their desire for [her] to withdraw [her] charge."  *Ferrante Dep*. at 162:3-4.  Ms. Joy stated that the discussion centered

43. Ms. Ferrante expressly stated to them that she was not withdrawing her charge. PSAMF ¶ 44; DRPSAMF ¶ 44. Ms. Joy and Ms. Proulx wanted to set up a conference call with Mr. Johnson for August 19, 2011, but Ms. Ferrante refused and did not want to discuss her claim any further. DSMF ¶ 70; PRDSMF ¶ 70. Following the meeting, Ms. Joy told Ms. Ferrante that she wanted to keep the lines of communication open and checked to see how Ms. Ferrante was doing. DSMF ¶ 71; PRDSMF ¶ 71. There was also discussion by Ms. Joy or Ms. Proulx during one of the meetings (August 17 or 18) about mediating the claim. DSMF ¶ 72; PRDSMF ¶ 72.

On August 17, 2011, MAS began to reduce Ms. Ferrante's responsibilities and duties.[35] PSAMF ¶ 46; DRPSAMF ¶ 46. Ms. Ferrante identified fifteen tasks in her job description that she believed were taken away from her between August 17, 2011 and December 3, 2011. DSMF ¶ 101; PRDSMF ¶ 101.

On August 19, 2011, Mr. Johnson sent Ms. Joy an email, and copied Ms. Ferrante and Ms. Wing, with an attached letter regarding his investigation into Ms. Ferrante's allegations.[36] DSMF ¶ 73; PRDSMF ¶ 73. The letter documented his investigative findings, indicated that employees thought the office environment could

---

around "keep[ing] the lines of communication open" and that they "wanted to try to resolve the issues with Stephanie Ferrante." *Joy Dep.* at 56:16-24. Finally, Ms. Proulx testified in her deposition that she told Ms. Ferrante that she did not care whether she went through with her EEOC claim or not. *Proulx Dep.* at 29: 21-25. Given that there is record support for Ms. Ferrante's position, and viewing the evidence in the light most favorable to Ms. Ferrante, the Court accepts for the purposes of this Order that Ms. Joy and Ms. Proulx implied that Ms. Ferrante should withdraw her charge.

[35] MAS denies that any reduction occurred and states that Ms. Ferrante felt as though any time Ms. Proulx asked somebody other than her to do something, that she was losing a job function. DRPSAMF ¶ 46. In her deposition, however, Ms. Ferrante testified that after Ms. Proulx became involved in her claim, August 17, 2011, she believed she started losing certain job duties. PRDSMF Attach. 6, *Dep. of Stephanie Ferrante*, at 185:4-15 (ECF No. 42-6) (*Ferrante Dep. 6*). Because Ms. Ferrante's testimony supports her statement of fact, the Court admits it without qualification.

[36] The letter was dated August 18, 2011. PSAMF ¶ 45; DRPSAMF ¶ 45

be improved, and mentioned a general rift between Elder Services and Children's Services.[37] DSMF ¶ 74; PRDSMF ¶ 74. Employees confirmed a busy, chaotic environment, but no one mentioned any harassment, sexual harassment, or discrimination; Mr. Johnson did not ask about sexual misconduct. *Id.* Mr. Johnson also indicated in his letter that he attempted to speak on the phone with Ms. Ferrante to see if there was additional information he may have been unaware of, but that Ms. Ferrante declined the invitation. DSMF ¶ 75; PRDSMF ¶ 75. It was his opinion that the charge of sexual discrimination was "completely baseless and reckless" and he felt Ms. Ferrante should "withdraw the charge immediately". *Id.*

On August 22, 2011, Ms. Ferrante completed an intake questionnaire for the EEOC alleging that Ms. Joy and Ms. Proulx had attempted to force her to withdraw her EEOC charge. DSMF ¶ 76; PRDSMF ¶ 76.

On September 6, 2011, Mr. Johnson sent Ms. Ferrante an email regarding her charges of harassment and discrimination. Ms. Ferrante did not think she had anything new to report to him.[38] DSMF ¶ 77; PRDSMF ¶ 77.

Two days later, on September 8, 2011, MAS terminated Ms. Wing's employment. DSMF ¶ 78; PRDSMF ¶ 78. That same day, Ms. Ferrante met with

---

[37] Ms. Ferrante renews her objection to the statement that Mr. Johnson investigated the sexual nature of her complaint. PRDSMF ¶ 74. The Court has already noted its decision on this issue, and rejects Ms. Ferrante's objection with respect to this paragraph because the paragraph concerns what the August 19, 2011 letter stated, not what Mr. Johnson knew at the time of his investigation into her complaint.

[38] Ms. Ferrante denies that she testified that she "did not have anything further to report regarding complaints of further sexual harassment." PRDSMF ¶ 77. In her deposition, Ms. Ferrante testified "I don't believe I had anything new to report to [Mr. Johnson]". PRDSMF Attach. 6, *Ferrante Dep. 6* at 173:9 (ECF No. 42-6) (*Ferrante Dep. 6*). Based on Ms. Ferrante's testimony, the Court declines to accept Ms. Ferrante's denial and deems MAS's paragraph 77 admitted as qualified by Ms. Ferrante's deposition testimony.

Mr. Johnson and Ms. Joy; neither asked Ms. Ferrante to withdraw her claim. DSMF ¶ 79; PRDSMF ¶ 79. Ms. Ferrante felt that Mr. Johnson's meetings regarding her claim, his request to have a conference call with her, and his August 19, 2011 email, were retaliatory. DSMF ¶ 80; PRDSMF ¶ 80. On September 12, 2011, Mr. Johnson sent Ms. Ferrante a letter memorializing their meeting on September 8, 2011. DSMF ¶ 81; PRDSMF ¶ 81. The letter indicated that Ms. Ferrante had given him no new information as to any ongoing problems as to ongoing sexual harassment.[39] DSMF ¶ 82; PRDSMF ¶ 82.

### 8. Ms. Ferrante's Co-Worker Loses His Job After Complaining to Human Resources

On August 22, 2011, Duane Manning, then a human resources assistant at MAS, sent a letter to Ms. Joy complaining that on August 17, 2011, he heard Ms. Joy and Ms. Proulx "make a vigorous attempt to compel co-worker Stephanie Ferrante into withdrawing her charge of discrimination.[40] PSAMF ¶ 47; DRPSAMF ¶ 47.

---

[39]     Ms. Ferrante denies that she testified that she did not have anything further to report regarding complaints of further sexual harassment. PRDSMF ¶ 82. The Local Rules require that if the non-movant desires to place additional facts into the summary judgment record, she shall do so "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule." D. ME. LOC. R. 56(c). Ms. Ferrante did not place before the Court as a separate fact, her assertion that she had any other sexual harassment complaints to report to Mr. Johnson; therefore, the Court declines to accept Ms. Ferrante's denial.

[40]     MAS objected to this statement on the grounds that Ms. Ferrante misquotes the document and that "the document is not relevant or material to the current matter as it is factually wrong. Ms. Ferrante, Ms. Joy, and Ms. Proulx each testified that Ms. Ferrante was never asked to withdraw her charge". DRPSAMF ¶ 47. However, the Court has already analyzed whether Ms. Ferrante was pressured to withdraw her EEOC charge and found that, viewing the evidence in the light most favorable to Ms. Ferrante, she was. Furthermore, the fact is both relevant and material as it is offered to support Ms. Ferrante's retaliation claim.

     MAS also objected to the statement on the grounds that it is hearsay. However, if this case were to go to trial, Ms. Ferrante could call Mr. Manning as a witness, and he could testify to what he heard Ms. Joy and Ms. Proulx say to Ms. Ferrante because their statements are those of MAS representatives, and are thus admissible under the party opponent exception to the rule against hearsay. *See* FED. R. EVID. 801(d)(2)(A). The Court admits Ms. Ferrante's statement of fact as modified to comport with the record.

That same day, Mr. Johnson sent an email to Ms. Joy stating that "[i]n the current economic climate we need to make some hard choices", that MAS "need[s] to reduce overhead", and that the human resources department "has to be reduced by 1 person"; although he left the decision to Ms. Joy, he suggested that Mr. Manning be laid off "based on seniority".[41] PSAMF ¶ 48; DRPSAMF ¶ 48. Ms. Joy terminated Mr. Manning's employment that day.[42] PSAMF ¶ 49; DRPSAMF ¶ 49. Also, MAS advertised on JobsInMe.com for a human resources clerk in September 2011, and MAS did not notify Mr. Manning about this posting.[43] PSAMF ¶¶ 50, 51; DRPSAMF ¶¶ 50, 51. The human resources clerk position was filled on October 3, 2011 by Shawna Frechette, who did not have experience "in a human resource department, but [did have] experience in an office setting."[44] PSAMF ¶ 52; DRPSAMF ¶ 52.

---

[41]     MAS objected to this statement on the grounds that "the document speaks for itself but is not relevant or material to the current matter." DRPSAMF ¶ 48. The Court overrules MAS's objection.

[42]     MAS admitted that Ms. Joy laid off Mr. Manning on August 22, 2011, but it states that the fact is not relevant or material to the current matter. The Court overrules MAS's objection. .

[43]     MAS admitted posting the human resources clerk position in September 2011 and that it did not notify Mr. Manning of the job opening, but objected on the grounds that the document is neither relevant nor material to the current matter. DRPSAMF ¶¶ 50, 51. Additionally, MAS asserts, insofar as Ms. Ferrante is trying to present the evidence to show that the human resources clerk was the same position Mr. Manning held, this argument is misplaced and taken out of context. DRPSAMF ¶¶ 50, 51. Again, the Court admits Ms. Ferrante's statement regarding the job posting because it is both supported by the record and, viewing the evidence in the light most favorable to Ms. Ferrante, is both relevant and material to her retaliation claim. The Court notes MAS's arguments regarding the connection or lack thereof between Mr. Manning's role and the human resources clerk position, but the arguments go to weight, not admissibility.

[44]     MAS admits the statement but qualifies it on the grounds that Ms. Frechette had "relevant prior experience". DRPSAMF ¶ 52. MAS also objects to the statement on the grounds that it is neither relevant nor material. DRPSAMF ¶ 52. In her deposition, Ms. Frechette testified that she had experience in "answering phones, filing, [and] customer service". PSAMF Attach. 4, *Frechette Dep.* at 6:24-25 (ECF No. 43-4). Although those skills may be relevant to the position, the job posting listed "2 years working in a human resources position for a home health/behavioral health agency" as a requirement. PSAMF Attach. 1, *Johnson Ex.* 4. (ECF No. 43-1). Ms. Frechette admitted she had no prior human resources experience The Court considers this discrepancy, against the backdrop of the layoff of Mr. Manning, to be both relevant and material and admits Ms. Ferrante's fact as modified to reflect Ms. Frechette's prior work experience.

### 9. The Hiring and Scope of Courtney McLain's Role as Ms. Proulx's Administrative Assistant

On September 1, 2011, MAS posted a help wanted ad on JobsInMe.com for an office assistant who would report to the Director of Children's Services.[45] PSAMF ¶ 55; DRPSAMF ¶ 55. That same month, Ms. Proulx hired Courtney McLain as her administrative assistant.[46] PSAMF ¶¶ 57-59. Ms. McClain was already an employee at MAS, and she learned of the job opening through an internal posting before it was posted online. PSAMF ¶ 56. She approached Ms. Joy about her interest in the role.[47]

---

[45]     Ms. Ferrante states that "[o]n September 1, 201[1], MAS posted an ad on JobsInMe.com for an Administrative Assistant to Ms. Proulx". PSAMF ¶ 55. Ms. Ferrante cites her own affidavit – she cites paragraph 4 but the Court believes she intended to cite paragraph 2 – in support of her statement. *See Ferrante Aff.* ¶2. Her affidavit states that the posting was for an "Administrative Assistant for Children's Services." *Id.* The copy of the job posting attached to the affidavit lists the position as "Office Assistant" to report to the "Director of Children's Services." *Ferrante Aff.* Attach. 1, PageID # 643 (ECF 42-9) (*Ferrante Aff. Attach. 1*). MAS states that the role was "office assistant who would report to the Director of Children's Services". DRPSAMF ¶ 55. Because MAS's statement aligns with Ms. Ferrante's affidavit and the copy of the job posting, the Court modifies the fact in dispute to reflect the qualification MAS proposes.

[46]     MAS asserts that Ms. McLain was hired in November 2011 as an Administrative Assistant to all divisions, reporting to Ms. Proulx. DSMF ¶ 85. MAS cites Ms. McLain's deposition testimony, in which she said that she was a behavioral health professional and children's services coordinator for MAS until the end of November 2011, when she became an administrative assistant to Ms. Proulx. DSMF Attach. 2, *McLain Dep.* at 10:5-13 (ECF No. 39-2) (*McClain Dep.*). Ms. Ferrante disputes that Ms. McLain became an administrative assistant to all divisions at the end of November 2011 and states that on September 1, 2011, following Ms. Ferrante's refusal to withdraw her EEOC charge, MAS posted a help wanted ad on JobsInMe.com seeking applicants for the position of Administrative Assistant for Children's Services. PRDSMF ¶ 85; PSAMF ¶ 55. Ms. Ferrante cites a copy of a job description posted by MAS on JobsInMe.com to support her contention. *Ferrante Aff. Attach. 1.* MAS qualifies the statement, saying that the listed position was an Office Assistant who would report to the Director of Children's Services. DRPSAMF ¶ 55. Furthermore, MAS argues, the fact is neither relevant nor material. *Id.* The Court finds it is relevant because "office assistant" and "administrative assistant" are similar job titles, and both positions reported to Ms. Proulx then the Director of Children's Services. The Court has reviewed the underlying record and observes that the posting was indeed for an Office Assistant. Other than that qualification, the record evidence supports Ms. Ferrante's position, and viewing the evidence most favorably to her, the Court accepts her statement of fact that Ms. McLain became an Administrative Assistant to Ms. Proulx.

         MAS admits that Ms. Proulx interviewed Ms. McLain but denies that Ms. Proulx hired her. DRPSAMF ¶ 59. This qualification is of little consequence for purposes of the motion for summary judgment, and the Court accepts Ms. Ferrante's characterization.

[47]     MAS states that the citation does not support this statement, and that the statement is neither relevant nor material. DRPSAMF ¶ 58. There is record support for the statement on the preceding page of Ms. McLain's deposition where she stated that she sent a resume and letter of intent to Ms.

PSAMF ¶ 58; DRPSAMF ¶ 58.  She began to take over some of the job duties in late September and early October, and eventually fully transferred to the new role, in which she understood that her work would primarily be assisting Ms. Proulx as well as others in the office.[48]  PRDSMF ¶ 85; PSAMF ¶¶ 57, 59; DRPSAMF ¶ 57, 59.

The scope of Ms. McLain's responsibilities in the administrative assistant role is the source of some dispute between the parties.  MAS asserts that Ms. McLain performed work for the entire Westbrook office, and that she completed elder care assignments.  DSMF ¶ 89.  In support of its position, MAS cites Ms. McLain's deposition testimony:

> Q. What percent of your work was dedicated to assisting Kim as opposed to the rest of the office?
> [MR. BROOKS: Object to the form of the question.  If you understand, you can answer.]
> A. I feel that it was 100 percent for the office because Kim is part of the office.  There were some duties that I took over that Kim used to do and there were several other things that I assisted with the office that I would assist other people in the office, so I don't know what a percentage would be.
> Q. What were your responsibilities as the administrative assistant?
> A. It grew over time because we were just trying to figure out what my duties would be and I also had a caseload until the end of November, so I didn't have 40 hours a week to do that.  I started with payroll and I also tallied group supervision and then there were other things.  I helped assist with the quarterly visit reports for elder home care.  I assisted

Joy and Ms. Proulx.  *McLain Dep*. at 14:12-17.  The record reflects that Ms. McLain reached out to Ms. Joy about the position; this fact is relevant insofar as it explains how Ms. McLain ended up in the Administrative Assistant position.

[48]     Ms. Ferrante states that Ms. McLain "learned of MAS posting the position as administrative assistant reporting to Kim Proulx, and she 'understood her work would primarily be assisting Kim.'"  PSAMF ¶ 57.  MAS asserts that "Ms. McLain understood the position was 'administrative assistant for the whole office,' but that Ms. Proulx was her direct supervisor."  DRPSAMF ¶ 57.  Ms. Ferrante denies that Ms. McLain became an administrative assistant for all divisions, on the basis that she "understood her work would primarily be assisting Kim [Proulx]".  PRDSMF ¶ 85; PSAMF ¶ 57.  However, Ms. McLain testified in her deposition that she was "administrative assistant for the whole office" but that Ms. Proulx was her direct supervisor.  *McLain Dep*. at 15:7-8.  Because the record evidence supports MAS's statement of fact, the Court accepts its qualification and has amended the statement accordingly.  The Court overrules MAS's relevancy and materiality objection.

with - - with cleaning up the elder home care chart room, filing, I spent a couple weeks doing that, so there were several other things.

*McLain Dep.* at 20:5-25.

Ms. Ferrante denies that Ms. McLain performed work for the entire Westbrook office and that she assisted with other tasks. PRDSMF ¶ 89. In support of her position, Ms. Ferrante points to Ms. McLain's deposition testimony that she understood her work would primarily be assisting Ms. Proulx. PRDSMF ¶ 89. As presented by the parties, the record regarding the scope of Ms. McLain's role is somewhat limited, but both parties' statements regarding scope can coexist. It is possible Ms. McLain's role was to primarily assist Ms. Proulx, but also encompassed completing tasks for others in the Westbrook office. Therefore, the Court includes both parties' statements regarding the scope of Ms. McLain's role.

### 10. Ms. McLain's Overlapping Responsibilities and its Impact on Ms. Ferrante's Role

In Ms. Ferrante's view, her job responsibilities changed significantly after MAS hired Ms. McLain in September. PRDSMF ¶ 85. Ms. Ferrante asserts that either by September or October 2011,[49] Ms. McLain began to take over some of her administrative duties, and began to take over her day to day responsibilities.[50]

---

[49] Ms. Ferrante uses both months. In her paragraph 61, she states that "[b]y September of 2001, Ms. McLain began to take over Ms. Ferrante's day to day responsibilities." PSAMF ¶ 61. In her paragraph 72, she states that "[b]y October of 2011, Ms. McLain began to take over Ms. Ferrante's day to day responsibilities." PSAMF ¶ 72. The Court has included both months as alternatives.

[50] MAS denies that Ms. McLain began to take over some of Ms. Ferrante's administrative duties. DRPSAMF ¶ 60. MAS states that Ms. McLain was working closely with Ms. Proulx before October 2011, "which is not surprising considering Ms. McLain reported to Ms. Proulx." *Id*. Viewing the evidence in the light most favorable to Ms. Ferrante, the record supports her statement and the Court declines to accept MAS's denial.

MAS also denies the statement that Ms. McLain "began to take over Ms. Ferrante's day to day responsibilities", and contends that Ms. Ferrante was gainfully employed during her employment.

PSAMF ¶¶ 60, 61; DRPSAMF ¶¶ 60, 61.  In October 2011, Ms. Ferrante noticed that Ms. McLain was doing a lot of the things that Ms. Ferrante typically did during her workday.  PSAMF ¶ 71; DRPSAMF ¶ 71.  On November 30, 2011, Ms. Ferrante noticed that Ms. McLain had filled out part of an intake form, a task that Ms. Ferrante was previously responsible for.  PSAMF ¶ 88.

### 11. General Changes to Ms. Ferrante's Role

Ms. Ferrante's position description as Ms. Proulx's administrative assistant listed thirty-one duties, including large and small projects.  PSAMF ¶ 54; DRPSAMF ¶ 54; PRDSMF ¶ 88.  During her employment at MAS, Ms. Ferrante never received a memo regarding a change to her job description, nor was she told that her job description or her responsibilities were changing.  DSMF ¶ 90; PRDSMF ¶ 90.  One of the primary functions of Ms. Ferrante's job was maintaining client charts.[51]  DSMF ¶ 103; PRDSMF ¶ 103.  Ms. Ferrante's position description also included general office duties, and if Ms. Proulx did not ask her to do those duties, she felt was losing her responsibility for that line item on her job description.[52]  PRDSMF ¶ 91.

---

DRPSAMF ¶ 61.  While that may be true, it is also possible that Ms. Ferrante's job responsibilities were eroding during that time, and viewing the facts in the light most favorable to Ms. Ferrante, the Court accepts her statement.

[51]     Ms. Ferrante denies this statement and qualifies it by stating that by early December 2011, Ms. Ferrante wrote that "[m]y job is reduced to nothing."  PRDSMF ¶ 103.  Even viewing the evidence in the light most favorable to Ms. Ferrante, her qualification does not respond to MAS's assertion, and the Court admits MAS's statement.

[52]     The parties quibble about whether, when Ms. Proulx assigned tasks that were arguably within Ms. Ferrante's scope of responsibility as director's assistant, Ms. Ferrante was actually losing a job function or she merely perceived a loss of job function.  *See* DSMF ¶ 91, PRDSMF ¶ 91.  Both parties cite Ms. Ferrante's deposition, in which she testified:

> Q. So if [Ms. Proulx] asked somebody other than you to do something, then you perceive that that was you losing a job function.
> A. It was.

Ms. Ferrante acknowledges that in mid-October 2011, she had work to do, was productive, gainfully employed, and was completing tasks outlined in her job description.[53] DSMF ¶¶ 96, 97; PRDSMF ¶¶ 96, 97. However, when she completed her projects, "they were done." PSAMF ¶ 73; DRPSAMF ¶ 73.

On November 2, 2011, Ms. Proulx gave Ms. McLain a list of tasks to complete while Ms. Proulx was away on vacation, tasks previously Ms. Ferrante's responsibility.[54] PSAMF ¶ 75; DRPSAMF ¶ 75. On or around December 2, 2011, Ms. Ferrante wrote that, "[m]y job is being reduced to nothing."[55] PSAMF ¶ 90; DRPSAMF ¶ 90. By December 2, Ms. Ferrante was "a photocopy and file person, and

---

PRDSMF Attach. 7, *Ferrante Dep.* at 186:25-187:2 (ECF No. 42-7) (*Ferrante Dep. 7*). Based on Ms. Ferrante's deposition testimony, MAS's paragraph is accurate and the Court rejects Ms. Ferrante's denial.

[53] MAS asserts that between July and December 2011, "Ms. Ferrante was completing tasks outlined in her job description and had work to do during this period of time", and that Ms. Ferrante was "productive and gainfully employed the whole time" she worked at MAS. DSMF ¶¶ 96, 97. Ms. Ferrante denies this, arguing that the portion of Ms. Ferrante's deposition testimony on which MAS's assertion relies, was referring to mid-October 2011 only. *See Ferrante Dep. 7* at 195:19-196:3. The Court reviewed the deposition transcript and, viewing the evidence in the light most favorable to Ms. Ferrante, concludes that the testimony referred to October 2011 rather than the entire span of Ms. Ferrante's employment with MAS. Furthermore, the Court notes, Ms. Ferrante testified at length about not having work to do toward the end of her employment, which directly contradicts MAS's assertions in its paragraphs 96 and 97. The Court altered MAS's paragraphs 95 and 96 to accurately reflect the cited record.

[54] MAS denies the statement on the grounds that "there is no indication of what tasks were included on the alleged 'to do' list resulting in mere speculation by Ms. Ferrante". DRPSMF ¶ 75. Ms. Ferrante's November 2, 2011 Memorandum for Record states,

> I saw Courtney [McLain] had a list. I said is that your to do list? She goes yes, while Kim [Proulx] is out. Looked like something her Assistant would be given. Courtney is functioning as Kim's assistant she is doing the same things I did for Kim when she went to Sturgis for her last vacation.

PRDSMF Attach. 11, *Nov. 2, 2011 Mem. for Record*, PageID # 650 (ECF No. 42-11) (*Nov. 2 MFR*). After reviewing the underlying record and viewing the evidence in the light most favorable to Ms. Ferrante, the Court concludes that the record supports her statement that she saw the task list and recognized that her previous responsibilities had been assigned to Ms. McLain. The Court includes Ms. Ferrante's statement.

[55] MAS objected to this statement on the ground that "the document speaks for itself." DRPSMF ¶ 90. This is a frivolous objection and the Court overrules it. A statement of material fact is supposed to summarize underlying evidence.

that was the extent of [her] duties"; all of her responsibilities had been taken away.[56]

PSAMF ¶ 92; DRPSAMF ¶ 92.  Ms. Ferrante feared that her job performance was

being scrutinized and singled out.[57]  PSAMF ¶ 95; DRPSAMF ¶ 95.

### 12. Muriel Blanc's Discussions with Kim Proulx Regarding Stephanie Ferrante's Claim

On or about September 14, 2011, Ms. Proulx informed Ms. Blanc, a coworker

of Ms. Ferrante's, that Ms. Ferrante had filed a hostile environment lawsuit, and that

Ms. Proulx and Ms. Joy had "looked it up" and discovered that Ms. Ferrante could

receive $300,000.[58]  PSAMF ¶ 62; DRPSAMF ¶ 62.  Ms. Proulx then warned Ms. Blanc

that she was "not allowed to talk to Stephanie".[59]  PSAMF ¶ 63; DRPSAMF ¶ 63.

Ms. Blanc did not heed Ms. Proulx's warning, however.  On or about September

16, 2011, Ms. Blanc told Ms. Ferrante that it was wrong and illegal for MAS to harass

her because of the lawsuit and to prohibit co-workers from speaking to her.[60]  PSAMF

¶ 64; DRPSAMF ¶ 64.  On one occasion after Ms. Blanc spoke to Ms. Ferrante, Ms.

---

[56]     MAS contends that Ms. Ferrante was gainfully employed.  DRPSAMF ¶ 92.  This does not squarely contradict Ms. Ferrante's statement, and the Court rejects MAS's denial.

[57]     Ms. Ferrante's paragraph 95 reads that her "job performance was being scrutinized and singled out."  PSAMF ¶ 95.  MAS denied this statement.  DRPSAMF ¶ 95.  The Court reviewed the portion of Ms. Ferrante's deposition that she cited to support the paragraph and found the following statement:  "Yeah.  Fear for loss of my job and my job performance being scrutinized and singled out."  *Ferrante Dep. 7 at* 201:25-202:1,  The Court amended the paragraph to more accurately reflect Ms. Ferrante's testimony and rejects MAS's denial because the statement, as modified, is supported by the record.

[58]     MAS denies this paragraph.  DRPSAMF ¶ 62.  MAS states that "[t]his is hearsay, and is not relevant or material to the current matter."  *Id.*  The Court overrules these objections.

[59]     MAS denies this paragraph and objects to this statement on hearsay and document speaks for itself grounds.  DRPSAMF ¶ 63.  The Court overrules these objections and rejects MAS's denial because the statement is supported by the record.

[60]     MAS denies this paragraph and objects on the grounds that Ms. Ferrante did not mention this comment in her deposition, nor did she reference it in any of her memoranda, and that the statement is irrelevant.  DRPSAMF ¶ 64.  First, the fact that Ms. Ferrante did not mention this comment in her deposition does not mean that a jury would be compelled to disbelieve it if she or Ms. Blanc testified to it at trial.  Furthermore, Ms. Blanc's MHRC complaint supports the statement. The Court overrules MAS's objections and rejects its denial because the paragraph is supported by the record.

Proulx "stormed into" Ms. Ferrante's cubicle, demanding some paperwork.[61]  PSAMF ¶ 65; DRPSAMF ¶ 65.  On or about September 20, 2011, Ms. Ferrante said good morning to Ms. Blanc, who in turn complimented Ms. Ferrante on her boots; a couple of minutes later, Ms. Proulx asked Ms. Blanc what she and Ms. Ferrante were talking about.[62]  PSAMF ¶ 66; DRPSAMF ¶ 66.  On or about October 4, 2011, Ms. Blanc said hello to Ms. Ferrante, prompting Ms. Proulx to "immediately badger" Ms. Blanc as to what they were talking about.[63]  PSAMF ¶ 67; DRPSAMF ¶ 67.

As Ms. Blanc continued to maintain contact with Ms. Ferrante, management "began to retaliate" against Ms. Blanc; for example, she was not granted promised time off, and Ms. Proulx was rude to Ms. Blanc when she would see her talk with Ms. Ferrante.[64]  PSAMF ¶¶ 68, 69, 70; DRPSAMF ¶¶ 68, 69, 70.

### 13.  Ms. Ferrante Becomes Increasingly Isolated

Beginning either late June or early July, 2011, Ms. Ferrante began to feel ostracized by her co-workers, especially when Ms. Wing was present.[65]  PSAMF ¶ 27;

---

[61]     MAS denies this statement on the grounds that none of Ms. Ferrante's memoranda mention this alleged incident.  DRPSAMF ¶ 65.  However, Ms. Blanc's MHRC complaint supports the statement.  Additionally, Ms. Ferrante's September 20, 2011 Memorandum for Record supports the statement.  *See* DSMF Attach. 1, *Sept. 20, 2011 Mem. for Record*, PageID # 433 (ECF No. 41-1) (*Sept. 20 MFR*).  Viewing the evidence in the light most favorable to Ms. Ferrante, the Court accepts the Ms. Ferrante's statement.

[62]     MAS denies the statement and objects on hearsay and document speaks for itself grounds that the statements included in the complaint include hearsay.  DRPSAMF ¶ 66.  The Court overrules these objections and rejects MAS's denial because the statement is supported by the record.

[63]     MAS denies this statement and objects on the ground that none of Ms. Ferrante's memoranda mentions this alleged incident.  DRPSAMF ¶ 67.  The Court overrules this objection and rejects MAS's denial because the statement is supported by the record.

[64]     MAS objects on the grounds that this statement is not material to the current matter, that Ms. Ferrante testified in her deposition that her MFRs contained the events that support her allegations of ostracism, and that none of the MFRs reference these alleged incidents.  DRPSAMF ¶¶ 68, 69, 70.

[65]     Referring to her June and July 2011 complaints to Ms. Joy, Ms. Ferrante's paragraph 27 states that "[f]rom that point, she was ostracized by some co-workers, especially with Ms. Wing present."  PSAMF ¶ 27.  MAS admits only that she felt ostracized by some co-workers in the Elder Services Department between June 28, 2011 and July 1, 2011.  DRPSAMF ¶ 27.  MAS also "notes that the term

DRPSAMF ¶ 27.[66]  MAS management discouraged employees from speaking with Ms.

Ferrante.  PRDSMF ¶ 98; *see also* PSAMF ¶ 63.  She cites a MHRC complaint filed

by Muriel Blanc, another former coworker of Ms. Ferrante's.  *See Blanc MHRC*

*Compl.*  In her complaint, Ms. Blanc stated that on September 14, 2011, Ms. Proulx

---

'ostracized' is vague and ambiguous." *Id.*  In support of paragraph 27, Ms. Ferrante cited portions of her deposition. PSAMF ¶ 27 (citing *Ferrante Dep. 4* at 96-97).  The Court reviewed this portion of Ms. Ferrante's deposition transcript and, to obtain context, the portions immediately before and after the cited portion and concludes that Ms. Ferrante's deposition testimony supports paragraph 27.  The Court declines to accept MAS's time-limited admission.

MAS also contends that the term "ostracized" is vague and ambiguous.  The dictionary definition of "ostracism" is "exclusion by general consent from common privileges or social acceptance." WEBSTER'S THIRD NEW INT'L DICTIONARY at 1598 (2002 ed.)  In her deposition, Ms. Ferrante complained that after she complained to Human Resource, co-workers glared at her, stared at her, would not talk to her, badgered her about what she told Human Resources, refused to help her, and that these problems became progressively intense.  *Ferrante Dep. 4* at 94:8-98:13.  It is clear what Ms. Ferrante means by the term "ostracized" in the context of this case.  The Court rejects MAS's contention.

[66]  The parties agree that Ms. Ferrante felt that she was ostracized by her coworkers after August 17, 2011, however they disagree about whether Ms. Ferrante was in fact ostracized, the cause of her feeling of ostracism, and the extent to which Ms. Ferrante was ostracized.  DSMF ¶ 99; PRDSMF ¶ 99; PSAMF ¶ 94; DRPSAMF ¶ 94.

MAS vigorously denies that Ms. Ferrante was in fact ostracized, and notes that Ms. Ferrante's memoranda indicate that she had "continuous interaction" with coworkers including Ms. Blanc, Ms. McLain, Ms. Coleman, Ms. Joy, Mr. Horton, Ms. Proulx, and others. DRPSAMF ¶ 94.  Second, MAS asserts that to the extent that any ostracism occurred, Ms. Ferrante "was ostracizing herself." DRPSAMF ¶ 94.  MAS states that Ms. Ferrante's demeanor changed, that she would stay in her office space, not talk to anyone, and that she would not participate in some office activities or go to lunch with anyone.  DSMF ¶ 98; DRPSAMF ¶ 94.  When Ms. Coleman invited Ms. Ferrante to lunch, she repeatedly refused her invitation.  DSMF ¶ 104.  MAS states that no one ever told Ms. Coleman that she should not have contact with Ms. Ferrante, nor did anyone ever discourage her from speaking with Ms. Ferrante.  DSMF ¶ 105.

MAS's position on whether its employees ostracized Ms. Ferrante or whether she ostracized herself is a legitimate factual issue to present to a jury.  But in the context of this motion, the Court is obligated, as MAS must know, to view the facts, including contested facts, in the light most favorable to Ms. Ferrante.  For purposes of the motion for summary judgment, the critical questions are whether the non-movant's facts are of evidentiary quality and are supported by the record.  Here, as the Court's discussion in the body of this opinion concludes, Ms. Ferrante meets these standards.  That MAS disagrees with her view of the facts and seeks to minimize the actions of her co-employees and to blame her for her own problems are matters that this Court may not at this stage resolve in favor of MAS.

By contrast, in her response to MAS's statement of material fact 98, Ms. Ferrante asserts that MAS not only discouraged employees from speaking with her but also harassed those employees who did speak with her.  PRDSMF ¶ 98.  In support of this assertion, Ms. Ferrante cited her material facts paragraphs 62 through 71 and 74 through 92.  To refer the Court to twenty-seven other paragraphs of statements of material fact does not comply with Local Rule 56(f).  Nevertheless, the Court reviewed each of the Plaintiff's cited paragraphs and was unable to find any record support for Ms. Ferrante's assertion that MAS harassed those employees who spoke with her and the Court has not included that part of Plaintiff's paragraph 98 in its recitation of the facts.

told her that Ms. Ferrante had filed a hostile environment lawsuit, and that she was "not allowed to talk to" Ms. Ferrante. *Id.* ¶ 3. On or about December 2, 2011, Ms. Ferrante wrote that, "[t]he majority of my coworkers do not talk to me, those that do know they may be reprimanded for doing so . . . I feel like I am totally alone. I am happy the weekend is near though, because it has been a long, horrible week here at MAS and I am drained physically and emotionally." PRDSMF Attach. 12, *Dec. 2, 2011 Mem. for Record*, PageID # 665 (ECF No. 42-12) (*Dec. 2 MFR*). Ms. Ferrante submitted a request for leave, citing "workplace harassment" as the reason. DSMF ¶ 110; PRDSMF ¶ 110.

On November 2, 2011, Ms. Ferrante was not involved or invited to a "Section 28" meeting with supervisors.[67] PSAMF ¶ 75; DRPSAMF ¶ 75.

On November 4, 2011, Ms. Ferrante did not want to go to work because of the stress.[68] PSAMF ¶ 76; DRPSAMF ¶ 76. At work, she discovered that Ms. McClain

---

[67] Ms. Ferrante's paragraph 75 states: "On 11/2/11, Ms. Ferrante was excluded from a section 28 meeting." PSAMF ¶ 75. To support this statement, Ms. Ferrante cites her deposition number 33 without a page number. Deposition exhibit 33 is a twenty-page exhibit, divided into two parts of ten pages each with the first section in Attachment 11 and the second in Attachment 12. It would have been helpful if Ms. Ferrante had offered a page cite. Nevertheless, the Court found the reference at page 4 of Attachment 11. It reads: "9:01a Section 28 meeting with supervisors I'm not involved or invited." The Court amended the language in paragraph 28 to conform to the actual wording of Ms. Ferrante's memorandum for the record.

MAS denied this paragraph. DRPSAMF ¶ 28. It affirmatively states that "Ferrante is not a Section 28 Supervisor and thus would not be involved in a Section 28 meeting." *Id.* The Court agrees with MAS that Ms. Ferrante was not a supervisor, but Ms. Ferrante must have documented this note for a reason. The Court infers that Ms. Ferrante must have attended similar meetings in the past in her role as administrative assistant to Ms. Proulx and considered the fact she was not involved or invited to the November 2, 2011 Section 28 supervisor's meeting to be of significance. Because the Court is required to view the facts in the light most favorable to Ms. Ferrante, the Court rejects MAS's denial and has included this paragraph in its recitation of facts. However, the Court has not attached much significance to paragraph 75 because its significance is not explained.

[68] MAS denies this statement, but its denial is not responsive to Ms. Ferrante's statement of fact. DRPSAMF ¶ 76. The Court rejects MAS's denial.

Furthermore, MAS asserted that the document, namely Ms. Ferrante's memorandum for record "speaks for itself." DRPSAMF ¶ 76. This objection is frivolous and the Court rejects it.

had taken over audits from her and Ms. Ferrante wrote that Ms. McClain "is doing my job and they are trying to hide it. I feel like am going to throw up."[69] *Id.*

On November 8, 2011, Ms. Ferrante entered Ms. Proulx's office and Ms. Proulx and Ms. McLain were there; no one acknowledged Ms. Ferrante.[70] PSAMF ¶ 78; DRPSAMF ¶ 78.

On November 11, 2011, Ms. Ferrante documented that she did not want to go to work because her duties had been taken away from her and wrote, "I honestly really don't know what I am going to do today."[71] PSAMF ¶ 79; DRPSAMF ¶ 79.

---

Finally, MAS says that the "remainder of the statements in the MFR [is] speculation, not fact." DRPSAMF ¶ 76. However, to the extent Ms. Ferrante's memoranda for record contain speculation, the Court has characterized the statements as her perceptions.

[69] MAS qualifies the statement, asserting that Ms. Ferrante "was notified that the audit needed to be done but took no steps to complete the task." DRPSAMF ¶ 76 (citing Ms. Ferrante's September 20, 2011 Memorandum for Record). As regards the audit issue, the September 20, 2011 Memorandum for Record states "I receive an email, sent last night from Kim, informing me of a QA/QI meeting audit in October (see attached) within it are the dates for the 100% audit." DSMF Additional Attachs.1, Sept. 20, 2011 Mem. For Record at PageID # 433 (ECF No. 41-1). The attachment is an email from Ms. Proulx to four individuals, including Ms. Ferrante, informing them that Ms. Proulx has "a QA meeting for October 26th at 9am", "[w]e will need to do a 100% audit on all clients and HR charts", and that "[w]e need to have a report done as well." *Id.* at PageID # 434. The Court finds that the underlying record does not support MAS's qualification to the effect that Ms. Ferrante failed to complete the assigned task. The Court rejects MAS's qualified response and adopts Ms. Ferrante's paragraph 76.

[70] MAS objects on the grounds that the record citation does not support the statement. DRPSAMF ¶ 78. Ms. Ferrante's November 8 Memorandum for Record states that "Kim is back from vacation. I enter her office to file paperwork in the treatment plan books[;] both Courtney and Tracy are in there I am not acknowledged I am ignored." PRDSMF Attach. 11, *Nov. 8, 2011 Mem. for Record*, PageID # 653 (ECF No. 42-11) (*Nov. 8 MFR*). The only part of the statement for which the record does not provide thorough support is that Ms. Proulx was present. Ms. Ferrante noted that Ms. Proulx was back from vacation, and that she was entering her office. The Court infers that Ms. Proulx was present in her own office. Viewing the evidence in the light most favorable to Ms. Ferrante, the Court finds that Ms. Proulx was present in her office at that time, rejects MAS's qualified response, and accepts Ms. Ferrante's paragraph 78.

[71] MAS objects on the grounds that the statement is vague and unsupported by the record. DRPSAMF ¶ 79. However, in the Court's view, Ms. Ferrante made a written record of the events of the day, presumably when her memory was fresh, that supports her statement. Viewing the evidence in the light most favorable to Ms. Ferrante, the Court rejects MAS's qualified response and admits Plaintiff's paragraph 79.

On November 14, 2011, Ms. Proulx told Ms. Ferrante to bring in her keys so that Ms. McLain could also use them.[72] PSAMF ¶ 80; DRPSAMF ¶ 80. Ms. Ferrante feared she would be terminated the following day. *Id.*

On November 15, 2011, Ms. Ferrante learned that Ms. McLain was now doing payroll.[73] PSAMF ¶ 81; DRPSAMF ¶ 81. Later that morning, she noticed the MAS Christmas party sheet; she did not have an invitation and Ms. McClain had taken over Ms. Ferrante's duties to organize such events.[74] PSAMF ¶ 81; DRPSAMF ¶ 81. Ms. Ferrante thought that organizing events of that type was one of her duties, and felt "reduced to a file clerk", "worthless and upset", and felt "tears welling up" in her eyes.[75] PSAMF ¶ 81; DRPSAMF ¶ 81.

---

[72] MAS denies the statement on the grounds that the cited document "does not support this proposition and otherwise speaks for itself." DRPSAMF ¶ 80. The "speaks for itself" objection is frivolous. As regards the contention that the document does not support the proposition, Ms. Ferrante wrote, "Kim emails me. . . . She states she wants me to bring my keys in, so Courtney and I can use them as well. I fear I am getting fired tomorrow." PRDSMF Attach. 11, *Nov. 14, 2011 Mem. for Record*, PageID # 655 (ECF No. 42-11) (*Nov. 14 MFR*). Ms. Ferrante's statement is supported by the record. The Court rejects MAS's denial and deems Plaintiff's paragraph 80 admitted.

[73] MAS denies this portion of Ms. Ferrante's paragraph 81 on the grounds that the document speaks for itself and that statement is speculation and unsupported by the evidence. DRPSAMF ¶ 81. The "document speaks for itself" objection is frivolous. Regarding the speculation and unsupported by the evidence objections, the Court reviewed the cited record and rejects MAS's denial. This part of the paragraph is clearly supported by Ms. Ferrante's November 15, 2011 Memorandum for Record.

[74] MAS denies paragraph 81 to the extent Ms. Ferrante states that she was not invited to the party. DRPSAMF ¶ 81. MAS denies this part of the statement because "the invitation was for clients and BHP/BHP-RC's so no invitation would go to Ms. Ferrante". DRPSAMF ¶ 81. To support its objection, MAS refers to Ms. Ferrante's November 15, 2011 Memorandum of Record, which does not indicate that no invitation would have gone to Ms. Ferrante. The Court rejects MAS's denial of this statement because its denial is not supported by the record.

MAS contends that the statement in Plaintiff's paragraph 81-that Ms. McClain had taken over Ms. Ferrante's duties to organize such events-is not supported by the record. DRPSAMF ¶ 81. The Court reviewed Ms. Ferrante's November 15, 2011 Memorandum of Record and concludes that the statement is clearly supported by the November 15, 2011 Memorandum. The Court rejects MAS's denial and deems this part of the paragraph admitted.

[75] MAS denies this statement as unsupported by the record. DRPSAMF ¶ 81. In her November 15, 2011 Memorandum for Record, Ms. Ferrante wrote, "If I was the Director's Assistant wouldn't I know about a holiday party for our division? Wouldn't I assist in preparing and making arrangements for such a party? I am reduced to a file clerk. I feel worthless and upset I feel tears welling up in my

On November 16, 2011, Ms. Proulx falsely blamed Ms. Ferrante for misfiling.[76]

PSAMF ¶ 82; DRPSAMF ¶ 82. On November 17, 2011, Ms. McClain asked Ms. Ferrante whether she would be part of a Secret Santa [gift] exchange and give money to Mr. Johnson and others in the NH office for gifts. PSAMF ¶ 83; DRPSAMF ¶ 83. When Ms. Ferrante refused, MAS quickly posted her response, thus publicizing it to all employees.[77] PSAMF ¶ 83; DRPSAMF ¶ 83. On November 18, 2011, Ms. Proulx emailed Ms. Ferrante and falsely accused her of making filing errors.[78] PSAMF ¶ 84;

eyes". *Nov. 15 MFR*. Ms. Ferrante's statement is in fact supported by the record, and is not speculative. The Court rejects MAS's denial and deems this part of paragraph 81 admitted.

[76] MAS objects on the grounds that document speaks for itself and that the November 16, 2011 MFR includes irrelevant hearsay, and mischaracterizes documents that otherwise speak for themselves. DRPSAMF ¶ 82. The general "document speaks for itself" objection is frivolous. MAS cites the November 16, 2011 MFR "and attachments." DRPSAMF ¶ 82. The November 16 MFR states, in relevant part, "I receive an email from Kim. . . . This email makes me so upset I feel hot and dizzy. She states I am responsible for all aspects of the charts and no one else files paperwork in the charts, which is FALSE." PRDSMF Attach. 12, *November 16, 2011 Mem. for Record*, Page ID# 657 (ECF No. 42-12). MAS did not provide a precise citation for the attachments it argues support its position. MAS's citation appears to point to an email exchange between Ms. Ferrante and Ms. McLain, DSMF Attach. 3 at PageID # 507 (ECF No. 41-3), but that email exchange is not responsive to Ms. Ferrante's statement. Without additional citation information, the Court accepts Ms. Ferrante's statement.

Additionally, the Court overrules MAS's hearsay-based objection and deems paragraph 82 admitted.

[77] MAS admitted paragraph 83, but asserted that the document upon which it relied contained hearsay and the paragraph is irrelevant. DRPSAMF ¶ 83. The Court overrules MAS's objections.

[78] MAS objects on the grounds that the document, which the Court presumes refers to the November 18, 2011 MFR, "improperly characterizes other documents that speak for themselves". DRPSAMF ¶ 84. In support of its objection, MAS cites the November 18, 2011 MFR "and attachments". DRPSAMF ¶ 84. MAS did not provide a precise citation for the attachments it argues support its position. MAS's citation may point to an email exchange between Ms. Ferrante and Ms. Proulx on November 18, 2011 with a subject heading of "charts". In that email exchange, Ms. Ferrante identified errors she found while "thinning" certain clients' charts. DSMF Attach. 3, *Email from Stephanie Ferrante to Kim Proulx*, Nov. 18, 2011, 8:01 a.m., PageID # 528 (ECF No. 41-3). Ms. Proulx responded, "In reviewing your email it appears we need to set up a time to meet as some of this information is not correct. . . . It is very important that the charts are in compliance and filed correctly. The state may visit us at any time and our license depends on the professional state of the charts." DSMF Attach. 3, *Email from Kim Proulx to Stephanie Ferrante*, Nov. 18, 2011, 11:53 a.m., at PageID # 527 (ECF No. 41-3). The attached document to which this email makes reference itemizes a number of asserted errors. *Id.* at 528-29. This interchange clearly establishes that Ms. Proulx was accusing Ms. Ferrante of committing filing errors.

Reviewing Ms. Ferrante's Memorandum of Record dated November 18, 2011, the Court concludes that Ms. Ferrante thought Ms. Proulx's allegations were false. The Court rejects MAS's denial and deems paragraph 84 admitted.

DRPSAMF ¶ 84. Ms. Ferrante responded to Ms. Proulx's email, complaining to her of continued "harassment and retaliation".[79] PSAMF ¶ 85; DRPSAMF ¶ 85.

On November 28, 2011, everyone in the office ate lunch in the conference room, but no one asked Ms. Ferrante if she wanted to join them.[80] PSAMF ¶ 86; DRPSAMF ¶ 86.

On November 29, 2011, Ms. Ferrante found a staff roster on a photocopier that did not have her name on it, and brought the omission to Ms. Proulx's attention.[81] PSAMF ¶ 87; DRPSAMF ¶ 87.

On November 30, 2011, a Section 28 meeting was held that Ms. Proulx attended and Ms. Ferrante was not included.[82] PSAMF ¶ 88; DRPSAMF ¶ 88. That day, Mr. Johnson arrived at the office and nearly all staff had lunch together in the

---

[79]    MAS denies the statement, asserting that the document does not support Ms. Ferrante's proposition. DRPSAMF ¶ 85. To support her statement of fact, Ms. Ferrante cites an email in which she wrote that she "[did] not feel free to raise any more concerns in a meeting" with Ms. Proulx about the office files, and that she believed that the "harassment and retaliation" she had "endured and continue[d] to endure" would impact any concerns she raised. PRDSMF Attach. 12, *Email from Stephanie Ferrante to Kim Proulx*, Nov. 18, 2011 at 3:23 p.m., PageID # 660 (ECF No. 42-12). The underlying record supports Ms. Ferrante's statement of fact, and the Court rejects MAS's denial and deems paragraph 85 admitted.

[80]    Ms. Ferrante also states in paragraph 86, "[w]hen . . . she went into the conference room, everyone became quiet". PSAMF ¶ 86. MAS denies Ms. Ferrante's paragraph 86 on the grounds that the record does not support Ms. Ferrante's assertion. DRPSAMF ¶ 86. The Court reviewed the November 28, 2011 MFR, Ms. Ferrante's record support for the statement, and agrees that it does not support the statement that everyone became quiet when Ms. Ferrante went into the conference room. However, the Court finds support for Ms. Ferrante's statement that everyone ate lunch in the conference room without Ms. Ferrante, and admits that portion of her statement.

[81]    MAS objects on the basis that Ms. Ferrante relies on hearsay to make assumptions as to the meaning of the document. DRPSAMF ¶ 87. The Court reviewed the November 29, 2011 MFR and finds it supports the statement. Ms. Ferrante's paragraph does not interpret the significance of her name not being on the list; the Court admits the statement over MAS's objection.

[82]    MAS states that because Ms. Ferrante was not a Section 28 Supervisor, she would not have attended a Section 28 meeting. The Court addressed this issue above in footnote 68 and, on the basis of that footnote, the Court rejects MAS's denial and deems paragraph 88 admitted.

conference room, but Ms. Ferrante was not invited to join them.[83]   PSAMF ¶ 88; DRPSAMF ¶ 88.

On December 1, 2011, Ms. Proulx distributed a winter call chart and staff roster to the entire office, and Ms. Ferrante's name was not on the staff roster.[84] PSAMF ¶ 89; DRPSAMF ¶ 89.  Ms. Proulx distributed an updated chart a short time later that still did not include Ms. Ferrante's name.[85]  PSAMF ¶ 89; DRPSAMF ¶ 89.

On December 2, 2011, Ms. Ferrante arrived at the MAS office feeling anxious.[86] PSAMF ¶ 90.  She felt "totally alone", that her "job [was] reduced to nothing", that she was "getting blamed for all mistakes occurring within the Children's Service charts", and recorded that the majority of her coworkers were not talking to her.[87] PSAMF ¶ 90.  At 2:45 p.m. that day, Ms. Ferrante requested leave because of "workplace harassment."  PSAMF ¶ 91; DRPSAMF ¶ 91.

### 14.    Ms. Ferrante was not Trained on Six Tasks in Her Job Description

---

[83]      MAS objects on the grounds that the document speaks for itself and is "littered with hearsay". DRPSAMF ¶ 88.  The document "speaks for itself" objection is frivolous.  The Court reviewed the November 30, 2011 Memorandum of Record and overrules MAS's hearsay objection as to Ms. Ferrante's recorded recollection of who was in the conference room for lunch and whether she was invited to join them.

[84]      MAS denies this statement, but provides no specific grounds for its objection.  DRPSAMF ¶ 89.  The Court reviewed the record citation and finds support for Ms. Ferrante's statement and therefore admits it.

[85]      MAS denies this statement, but provides no specific grounds for its objection.  DRPSAMF ¶ 89.  The Court reviewed the record citation and finds support for Ms. Ferrante's statement and therefore admits it.

[86]      MAS denies this statement on the grounds that the document speaks for itself.  DRPSAMF ¶ 90.  This objection is frivolous.  The Court reviewed the record citation and finds support for Ms. Ferrante's statement and therefore admits it.

[87]      MAS denies this statement on the grounds that the document speaks for itself.  DRPSAMF ¶ 90.  This objection is frivolous.  The Court reviewed the record citation and finds support for Ms. Ferrante's statement and therefore admits it.

Ms. Ferrante identified six tasks in her job description that she believed she did not receive adequate training for. DSMF ¶ 83; PRDSMF ¶ 83. After August 17, 2011, Ms. Ferrante believes that she did not get job training she had hoped to receive, including: (1) how Ms. Proulx liked her minutes; (2) discharging clients in "Home Trak"; (3) audit procedures; (4) printing off APS forms and getting into the APS system; (5) payroll and billing training; (6) monthly supervision memos; and (7) following government laws and company policies. DSMF ¶ 84; PRDSMF ¶ 84.

On September 19, 2011, Ms. Proulx offered to provide Ms. Ferrante with more training on how to file, but Ms. Ferrante did not accept her offer because she felt she

already knew how to file.[88]  DSMF ¶ 92; PRDSMF ¶ 92.  Ms. Ferrante did not request additional training for the items on her list.[89]  DSMF ¶ 93; PRDSMF ¶ 93.

### 15.    The October 2011 Quarterly Audit

In October 2011, Ms. Proulx asked Ms. McLain and Ms. Jess Arnold to perform the quarterly audit.[90]  DSMF ¶ 94; PRDSMF ¶ 94.  Ms. Proulx asked them to do it

---

[88]    MAS states that "Ms. Proulx offered to provide Ms. Ferrante with more training; however, Ms. Ferrante refused the additional training."  DSMF ¶ 92.  Ms. Ferrante qualifies the statement, adding that Ms. Proulx said she would be happy to provide more training on how to file, and that Ms. Ferrante did not take her up on that offer because she already knew how to file.  PRDSMF ¶ 92.  Ms. Ferrante cites her deposition in support of her statement.  In relevant part, she gave the following testimony at her deposition:

> Q. I'm showing you a document that's been marked at Exhibit 29.  It's an email exchange between you and Kim Proulx on September 19, 2011; is that right?
> A. Yes.
> Q. And this starts with you sending an email to Ms. Proulx about sending you the children's client ID list, etcetera; is that right?
> A. Yes.
> Q. And Ms. Proulx responds in her email, at the very end of this one on September 19, "if you feel you need more training, I would be happy to provide that to you."
> A. Yes.
> Q. Did you take her up on that offer?
> A. I did not take her up on that offer to help me learn how to file, no.
> Q. And did you ever ask Ms. Proulx for more training specific to the items that you have identified?
> A. No.

*Ferrante Dep. 7* at 189:8-25.  Ms. Ferrante also points out testimony later in her deposition where she said that she did not believe she needed any assistance in filing or that her work performance was ever an issue.  *Ferrante Dep. 7* at 203:1-6.  Viewing the evidence in the underlying record in the light most favorable to Ms. Ferrante, the Court accepts her qualification.

[89]    Ms. Ferrante denies MAS's statement and qualifies it by saying that she "only did not request more specific training on how to file as she knew how to file".  PRDSMF ¶ 93.  However, the deposition testimony she cites in support of her qualification is identical to that which she cited in her paragraph 92, and she essentially admits that she did not request additional training.  *See* PRDSMF ¶ 92; Footnote 72, supra.  Therefore, the Court rejects Ms. Ferrante's qualification.

[90]    Ms. Ferrante denies that she had any involvement in the October 2011 audit.  PRDSMF ¶ 94. This essentially comports with MAS's statement, so the Court admits the portion of MAS's statement regarding Ms. McLain and Ms. Arnold.  However, the parties clash over the reason behind Ms. Proulx's request.  According to MAS, Ms. Ferrante did not approach Ms. Proulx about the October audit she believed she was responsible for, and Ms. Proulx asked Ms. McLain and Ms. Arnold to complete the audit because it was "getting too close to the time it was due and was not done".  DSMF ¶¶ 94, 95. MAS cites Ms. McLain's deposition, and Ms. Ferrante's deposition.  DSMF ¶ 94.  Ms. McLain testified to the following during her deposition:

Q. Okay. Did you have any responsibility with regard to [the October 2011] audit?
A. Kim had asked Jess Arnold and I to do it because it was getting too close to the time and it wasn't done.
Q. All right. Who had the responsibility for doing the October audit?
A. It was supposed to be Stephanie.
Q. So that's something you took over?
A. I did not take over. Kim asked me to do it because Stephanie did not do it.
Q. So let me get this. Stephanie was responsible to do it, correct?
A. Uh-huh, yes.
Q. And you ended up doing at least part of it?
A. Yes.
Q. Did you do part of it or the whole thing?
A. I did part of it.
Q. Okay. Who did the other part of it?
A. Jess.
Q. And Jess' last name is?
A. Arnold.

*McLain Dep.* at 30:5-25. MAS also cites Ms. Ferrante's deposition, in which she acknowledged that Ms. Proulx sent out an email stating that an audit would be conducted on October 12th, 13th, and 14th, and testified to the following:

Q. Did you have any follow-up questions for Ms. Proulx concerning this audit that she said was coming up?
A. I asked about the audit and I was never given any answers about the audit to everyone that I asked.
Q. Who did you ask about the audit?
A. I asked Kim, I asked Courtney, Jessica Arnold that worked there, and Muriel, Andra.
Q. What did you ask Kim about the audit?
A. I asked her when the audit was going to happen.
Q. So her reference to October 12th, 13th, and 14th was unclear?
A. It didn't happen on those dates. At least I wasn't aware that it did. I still don't know to this day when that audit took place.
Q. So with respect to that - - that audit, at what point - - well, on October 12, did you do any work on this audit?
A. No.
Q. Did you ask Ms. Proulx about the audit on October 12th?
A. On that date, no, I don't believe I did, but I - -
Q. So you never approached Ms. Proulx on October 12 about this audit that you thought you should be doing, right?
A. I don't think I did on the 12th, 13th, and 14th.
. . .
Q. So October 12 rolls around and you don't start working on the audit, correct?
A. Correct.
Q. And you don't ask Kim whether you should be working on the audit?
A. There were times I felt uncomfortable even looking in her general direction.
Q. October 13 comes around and you don't work on the audit.
A. Correct.
Q. And you didn't ask Kim whether you should be working on the audit?
A. Correct.
Q. And October 14 comes around and you don't work on the audit, right?

because "it was getting too close to the time it was due and was not done". DSMF ¶ 94. Ms. Ferrante "asked about the audit and [she] was never given any answers about the audit to everyone [she] asked." PRDSMF ¶¶ 94, 95. She saw coworkers with audit sheets and asked them what they were doing but no one would tell her. PRDSMF ¶¶ 94, 95 (citing *Ferrante Dep. 7* at 193: 3-6).

### 16. Leave Requests[91]

On or about October 26, 2011, Ms. Ferrante placed a request in Ms. Proulx's office bin to take time off on November 3, 2011 to attend a medical appointment. DSMF Additional Attachs. Attach. 2, *Oct. 31, 2011 Mem. for Record*, PageID # 482 (ECF No. 41-2) (*Oct. 31 MFR*). On October 31, Ms. Proulx sent an email to MAS staff that stated "a lot of staff" were taking vacation in November, included a list of those with approved leave, and stated that she could not approve any more time off that month. PRDSMF Attach. 11, *Oct. 31, 2011 Email from Kim Proulx to MAS Staff*, Page ID# 648 (ECF No. 42-11) (*Oct. 31 Proulx Email*). Ms. Ferrante's name was not

---

A. No, I don't.

*Ferrante Dep. 7* at 191:20-192:23; 194:12-195:1.

In response, Ms. Ferrante asserts that not only did she ask to speak to Ms. Proulx about the audit, but also that she was excluded from the audit process. PRDSMF ¶¶ 94, 95. The portion of her deposition testimony which both she and, notably, MAS cite supports her statement regarding Ms. Proulx. *See Ferrante Dep. 7* at 192:2-10. Viewing the evidence in the light most favorable to Ms. Ferrante, the Court accepts Ms. Ferrante's qualification that she did ask Ms. Proulx about the audit.

With respect to whether Ms. Ferrante was excluded from the audit process, the parties' statements are not mutually exclusive. Ms. Ferrante could have asked a number of people about working on the audit, and Ms. Proulx could have asked Ms. McClain and Ms. Arnold to complete the audit because Ms. Ferrante had not done it. At the same time, it would be difficult to do something as an employee that the supervisor did not let you know you were supposed to do. The Court includes both parties' statements for the purposes of this Order.

[91] The parties' submissions on leave request are so sparse they make little sense without additional context. The Court added some non-cited facts to supply the background.

on the list of approved leave.[92]   PSAMF ¶ 74; DRPSAMF ¶ 74; *Oct. 31 MFR*.   Ms. Ferrante emailed Ms. Proulx asking for clarification, and Ms. Proulx asked to see her in her office.  *Oct. 31 MFR*.   Ms. Proulx said that she did not receive the request slip; Ms. Ferrante found it in one of Ms. Proulx's office bins and handed it to her for approval, which she granted.  *Oct. 31 MFR*.

### 17.   Ms. Ferrante Resigns

Ms. Ferrante resigned on December 5, 2011, and in her view, her resignation was caused by months of harassment and retaliation, bringing her to the point where she could not take it any longer.[93] PSAMF ¶ 96; DRPSAMF ¶ 96. [94]

## II.   THE PARTIES' POSITIONS

### A.   Count I:  Sex Discrimination

#### 1.   MAS's Motion

MAS's position is, in essence, that Ms. Ferrante's claim fails as a matter of law because she cannot make out a prima facie case for a sexually hostile work environment.  *Def.'s Mot.* at 2.  Specifically, MAS argues she has failed to establish (1) that harassment was based on her sex, (2) that the harassment was so severe or

---

[92]   MAS objects to Ms. Ferrante's paragraph 74, without providing any grounds for its objection. The Court therefore admits Ms. Ferrante's statement.

[93]   Ms. Ferrante posits a paragraph 97 about a meeting that Mr. Johnson and Ms. Proulx had with staff after Ms. Ferrante resigned.  PSAMF ¶ 97.  But MAS objected in part because the part of the record that Ms. Ferrante cited is not before the Court.  DRPSAMF ¶ 97.  The Court agrees with MAS.  It could not locate the record and the Court has not included Plaintiff's paragraph 97.

[94]   Ms. Ferrante states "[a]s a result of the harassment and months of retaliation with no end in sight, Ms. Ferrante could take it no longer and thus on December 5, 2011, Ms. Ferrante was forced to resign."  PSAMF ¶ 96.  In order to avoid setting forth a legal conclusion as a fact, the Court altered this paragraph to clarify that this is Ms. Ferrante's view of why she resigned.  Although MAS denied the paragraph, the Court rejects MAS's denial of the rephrased paragraph and deems it admitted.

pervasive to alter the conditions of her work environment, or (3) that some basis for employer liability exists. *Def.'s Mot*. at 3-10.

MAS contends that Ms. Ferrante cannot prove that the "harassment occurred because she was a woman, instead, the evidence shows that the alleged statements of a sexual nature were generally made to groups of women and not directed at Ms. Ferrante . . . ." *Id*. at 3. MAS argues that because Ms. Ferrante "was part of an all-female team supervised by a female," she has to meet the "high burden of proof in same-sex hostile work environment cases" set forth in *Oncale v. Sundowner Offshore Servs*., 523 U.S. 75, 81 (1998). *Id*.

MAS concedes that Ms. Wing's statements "maybe have been unprofessional and vulgar," but argues that "there is no evidence Ms. Wing made them 'because of' [Ms. Ferrante's], or anyone else's, sex." *Id*. at 5. MAS asserts that Ms. Ferrante's claim fails under the *Oncale* test because Ms. Ferrante (1) "has not alleged, nor is there evidence to support, a conclusion that Ms. Wing is homosexual or any of her alleged conduct was motivated by sexual desire", (2) "has not alleged, nor is there any evidence to support, Ms. Wing was motivated by a general hostility toward women", and (3) has offered "no comparative evidence that Ms. Wing treated men and women differently." *Id*. at 4-5. On the third point, MAS argues that Ms. Ferrante "cannot offer direct comparative evidence to support a same-sex sexual harassment claim" because the workplace was not mixed-sex. *Id*. at 5.

Next, MAS contends that "the behavior alleged was not sufficiently severe or pervasive to alter the conditions of employment." *Id*. MAS maintains that Ms.

Ferrante has identified only six comments[95] during May and June 2011, and that the comments "are insufficient to support [Ms. Ferrante's] sexually hostile work environment claim" because (1) "the comments were infrequent; the record reveals six comments over approximately fifty (50) days when Ms. Ferrante reported to Ms. Wing, with only five allegedly occurring at work", (2) "Ms. Wing's comments in no way impaired [Ms. Ferrante's] ability to effectively complete her job, nor altered the terms and conditions of her employment". *Id.* at 6-7. Specifically, MAS notes, Ms. Ferrante "admits that after Ms. Wing shared her 'scuba Steve' story[,] . . . [Ms. Ferrante] went back to work", and points out that Ms. Ferrante "could voluntarily remove herself from the allegedly objective conduct" at the restaurant after work on June 17, 2011, but "chose not to." *Id.* at 7-8.

Finally, MAS argues that "Ms. Ferrante's sexual harassment claim fails because there is no basis for employer liability." *Id.* at 8. MAS notes that it "has a policy against unlawful harassment, provides employee training, and . . . has [the policy] posted in the workplace". *Id.* at 9. MAS maintains that, prior to receiving the EEOC charge on August 9, 2011, it had no notice that Ms. Wing's comments were sexual in nature. *Id.* at 8. Moreover, MAS argues, it responded to Ms. Ferrante's

---

[95] The "instances of alleged 'harassment'" MAS points to are (1) June 1, 2011, Ms. Wing said she was going home to "give her husband a nooner", (2) June 2, 2011, Ms. Wing said she was going to go home to "give her husband a nooner", (3) June 3, 2011, Ms. Wing told "a number of women" a story about how her husband got the nickname "Scuba Steve" and "relayed an off-color suggestion he had made for a care-giver to put on scuba gear and use a scrub brush to clean an obese patient's genital region", (4) June 17, 2011, after work at a restaurant, Ms. Ferrante "heard Ms. Wing discuss a pornographic video Ms. Wing had watched with her husband", (5) unknown date, "Ms. Ferrante heard Ms. Wing say she wanted to rub baby oil over an unidentified male's body", and (6) co-worker Keara Brown said that "shortly after Ms. Ferrante began working at MAS, Ms. Wing said that Ms. Ferrante had 'to be Italian because you've got dick-sucking lips.'" *Def.'s Mot.* at 6-7.

complaint "prompt[ly] and effective[ly] with a job change only a few days later" and gave Ms. Ferrante "a temporary (later permanent) transfer to another job with a different supervisor and a pay raise." *Id*. at 9. MAS asserts that it "conducted an immediate investigation of [Ms. Ferrante's] complaints, and ultimately terminated the employment of Ms. Wing on September 8, 2011." *Id*. at 9. MAS also characterizes Ms. Ferrante's behavior after her transfer as "refusal to engage MAS to provide additional evidence" of the alleged sexual harassment, and as "unreasonable". *Id*.

### 2.    Ms. Ferrante's Opposition

In response, Ms. Ferrante insists that she was harassed based upon sex when Ms. Wing made the offensive sexual comments, Ms. Ferrante "presented evidence of her discomfort" to Ms. Wing, and in response Ms. Wing not only did not "curb the offensive behavior, but she increased the sex-specific commentary right at Ms. Ferrante's cubicle." *Pl.'s Opp'n* at 11. Additionally, she maintains that *Oncale* actually supports her position, and that the "holdings in *Oncal[e]* also make clear a trier of fact could reasonably infer the harassment was based on sex." *Id*. Specifically, she points out that the *Oncale* Court held that Title VII does not bar same-sex discrimination cases, and that the harassing conduct "need not be motivated by sexual desire". *Id*. She asserts that a trier of fact "could reasonably [infer] that Ms. Wing's offensive sexual comments did amount to harassment based on sex given the use of sex-specific language directed in the presence of Ms. Ferrante and with knowledge that such behavior created a hostile work environment for Ms. Ferrante". *Id*.

Next, Ms. Ferrante disputes MAS's argument that the harassment at issue was not sufficiently pervasive, and asserts that a triable issue exists regarding whether the harassment was sufficiently pervasive. *Id.* at 12. She contends that she testified that the sexual comments by Ms. Wing "took place on a daily basis from the outset of her employment . . . and continued . . . [for] a period of over two months". *Id.*

Finally, Ms. Ferrante insists that a triable issue of fact exists with respect to employer liability. *Pl.'s Opp'n* at 12. She argues that MAS has not satisfied either prong of the so-called *Faragher* affirmative defense. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). She contends that a triable issue of fact exists with respect to the first prong because she "denies ever receiving notice or training of the sexual harassment policy prior to making her complaint". *Id.* She also points out that "Mr. Johnson admits he did not even investigate the sexual harassment aspect of the complaint." *Id.* Ms. Ferrante argues that she "did present evidence of speaking to Ms. Joy on June 28th and complaining of the sexual comments", that she "gave notice of the sexual misconduct in her statement dated July 5, 2011, describing it as a hostile work environment", and that she "repeated what she had told Ms. Joy" when she spoke to Mr. Johnson on July 7, 2011. *Id.* at 13. She contends that "a trier of fact could reasonably infer [she] did give notice of the sexual harassment to MAS in June and July, but MAS did not investigate the entirety of the claim". *Id.*

### 3. MAS's Reply

In reply, MAS argues that Ms. Ferrante "offers no evidence that the alleged comments by Wing were *because of* [Ms. Ferrante's] gender" and that Ms. Ferrante has failed to show that "Wing was hostile to the presence of women in the workplace." *Def.'s Reply* at 3-4 (emphasis in original). MAS insists that "the mere use of language regarding sex is insufficient to state a claim" of sex-based harassment. *Id.* at 4. MAS also notes that Ms. Ferrante failed "to even acknowledge that [she] worked in an all-female environment, [which] render[ed] inapplicable any consideration of comparative evidence". *Id.*

Next, MAS argues that Ms. Ferrante's arguments regarding the pervasiveness of the harassment are merely "[t]estimony reiterating allegations" which are insufficient to create genuine issues of material fact "'without providing specific factual information.'" *Id.* (citing *In re Light Cigarettes Marketing Sales Practices Litigation*, 751 F. Supp. 2d 196, 202 (D. Me. 2010)). MAS asserts that such "non-specific allegations of frequent harassment (especially in the face of [Ms. Ferrante's] extensive 'memoranda for record,' that records only a handful of incidents) are insufficient as a matter of law." *Id.* at 4.

Additionally, MAS disputes Ms. Ferrante's argument regarding employer liability. *Id.* MAS acknowledges that there is a dispute as to whether Ms. Ferrante was trained on the company's sexual harassment policy, but insists that issue "is not material as [Ms. Ferrante] was aware of her rights considering the MHRC rights posting, as well as her knowledge that talking to Ms. Joy was the appropriate course." *Id.* at 4 n.13 (internal citation omitted). Moreover, MAS asserts, "[i]n small work

environments, as at issue here, there is no genuine dispute that MAS took reasonable steps to inform employees of their rights." *Id.*

Finally, MAS disputes Ms. Ferrante's assertion that it cannot satisfy the elements of a *Faragher* affirmative defense. *Id.* at 4. MAS contends that the Maine Law Court has not adopted the *Faragher* standard, and instead employs the standard set in *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 47, 969 A.2d 897, 904, that the employer action taken must be "immediate and appropriate." *Id.* at 5. Applying that standard, MAS contends that "as soon as" Ms. Ferrante complained, "immediate steps were taken", and that MAS "attempted to further determine whether [Ms. Ferrante] was experiencing ongoing issues", despite Ms. Ferrante's "refus[al] to cooperate with the efforts." *Id.*

### B.    Count II:  Retaliation

#### 1.    MAS's Motion

MAS argues that Ms. Ferrante "experienced no unlawful retaliation and instead her claim rests entirely on perceived slights that are insufficient to establish a retaliation claim under the MHRA as a matter of law." *Def.'s Mot.* at 10. As a threshold matter, MAS insists that Ms. Ferrante "did not exhaust her administrative remedies with regard to any alleged act of retaliation after filing her charge with the EEOC on July 26, 2011, and thus she is not entitled to damages or attorney[']s fees for those claims". *Id.* at 11 (citing 5 M.R.S. § 4611, "[a]n aggrieved person . . . may file a complaint under oath with the commission stating the facts concerning the

alleged discrimination, except that a complaint must be filed with the commission not more than 300 days after the alleged act of unlawful discrimination").

MAS argues that the Court should only consider events occurring prior to July 26, 2011 because that was the date Ms. Ferrante filed her EEOC charge. *Id*. at 10. MAS contends that the retaliatory activity "involved discrete acts", *Id*. at 13, and that Ms. Ferrante's retaliation claims are not "'like or reasonably related to the allegations raised in her administrative charge'". *Id*. at 13 n.7. Thus, MAS argues, the Court should not consider an intake questionnaire that Ms. Ferrante signed and completed on August 22, 2011, which alleged that meetings on August 17 and August 18 were attempts to coerce her into dropping her charge. *Id*. at 10-11. MAS maintains that "an intake questionnaire form is not signed under oath, and therefore, is 'not considered to be a charge of discrimination'". *Id*. at 11 (quoting *Frank v. L.L. Bean, Inc.*, No. Civ. 04-221-P-S, 2006 WL 47557, at *6 (D. Me. Jan. 9, 2006)). Thus, MAS contends, the Court can only consider the facts covered in Ms. Ferrante's EEOC charge. *Id*. at 13.

Next, MAS argues that Ms. Ferrante "cannot make out a prima facie case of retaliation as her complaint to MAS's Human Resources Manager on June 28, 2011, about non-specific 'chaotic, hostile, and threatening' work environment in Ms. Wing's department was not protected activity." *Id*. at 14. MAS maintains that Ms. Ferrante "[a]t no time" mentioned "any facts that could reasonably lead Ms. Joy or anyone else at MAS to believe that [Ms. Ferrante] was complaining about a 'sexually' hostile work environment." *Id*. at 14-15. MAS notes that it "was careful" to have Ms. Ferrante

put her concerns in writing, and although MAS acknowledges that Ms. Ferrante used the "familiar buzzword 'hostile'", the word "sex" was "conspicuously absent." *Id.* at 15. MAS maintains that Ms. Ferrante "failed to relay any of the ribald comments she now attributes to Ms. Wing" when she "had every opportunity . . . to be specific." *Id.* at 15. Thus, MAS concludes, Ms. Ferrante's "failure to give any notice to MAS that she was complaining about a potentially unlawful sexual conduct renders her June 28 complaint to MAS unprotected" and, because the retaliation claim is tethered to the unprotected MHRA complaint, bars Ms. Ferrante's retaliation claim. *Id.* at 15.

Further, MAS argues that Ms. Ferrante cannot prove that MAS took adverse action against her. *Id.* at 15. Ms. Wing's statement to Ms. Ferrante that "her job was being done incorrectly", in the absence of other action, is not retaliatory conduct, MAS contends. In fact, MAS points out, "the evidence only points to positive job actions: a desirable transfer, a new supervisor, and a higher rate of pay." *Id.* at 16. Additionally, MAS argues, none of the other actions Ms. Ferrante points to—MAS's attempts to discuss her EEOC charge, removal of job duties, and "shunning" of Ms. Ferrante– either individually or collectively qualify as adverse actions as a matter of law. *Id.* at 16-19. Moreover, MAS contends, even if MAS asked her to withdraw her charge, such a request is not retaliatory conduct. *Id.* at 16 (citing *Torres v. Pisano*, 116 F.3d 625, 640 (2nd Cir. 1997)).

Finally, MAS argues that even if Ms. Ferrante can prove an adverse employment action, she cannot prove that the adverse employment action was causally related to Ms. Ferrante's protected activity. *Id.* at 20. MAS insists that the

EEOC charge and Ms. Ferrante's resignation four months later "did not occur in 'close proximity' and there is no evidence [MAS] was attempting to terminate [Ms. Ferrante] or force her to quit because she had filed the Charge". *Id.* at 20.

### 2. Ms. Ferrante's Opposition

Ms. Ferrante maintains that she can prove all of the prima facie elements of a retaliation claim: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between the protected activity and the adverse action. *Pl.'s Opp'n* at 14 (citing *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1054 (Me. 1992)).

Ms. Ferrante states that "it is undisputed that Ferrante filed a verified administrative complaint under oath alleging that she had been the victim of sex discrimination and retaliation . . . . [and] that [MAS] received notice of the administrative complaint." *Id.* at 14. Ms. Ferrante contends that MAS has failed to establish as a matter of law that she did not engage in protected activity because MAS's motion "does not address the administrative complaint", which Ms. Ferrante asserts is the protected activity at issue. *Id.*

Next, Ms. Ferrante asserts that she has presented "overwhelming evidence of the adverse actions" taken against her after she filed her administrative charges. *Id.* at 16. She contends that MAS's position regarding the scope of activity that the Court can consider has been rejected, and that "adverse employment actions arising out of the original discrimination complaint and occurring after the initial agency filing do not have to be exhausted." *Id.* at 17. Ms. Ferrante asserts that her "additional

allegations of adverse actions simply flow chronologically . . . after her administrative complaint." *Id.* She argues that the "discrete acts" approach discussed in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), does not apply, and that the controlling precedent is *Clockedile. Id.* (citing *Clockedile v. New Hampshire Dep't of Corrs.*, 245 F.3d 1, 6 (1st Cir. 2001)). Ms. Ferrante also disputes MAS's position that she cannot show MAS took adverse actions against her, asserting that "adverse actions include those which 'could dissuade an employee or former employee' from making complaints of retaliation.'" *Id.* at 17-18 (quoting *Thayer Corp. v. Reed*, 2011 U.S. Dist. LEXIS 74229, at *62 (D. Me. July 11, 2011)).

Finally, Ms. Ferrante argues that she has presented evidence that a causal link exists between her administrative complaint and her constructive discharge. *Id.* at 19. She asserts that MAS began "pressuring [her] to withdraw her complaint, reducing her responsibilities, advertising for her replacement[,] and hiring Ms. Mc[L]ain" within days of receiving notice of the protected activity. *Id.* This, she states, is sufficient for a trier of fact to reasonably infer that "the temporal link was less than thirty days." *Id.*

### 3.    MAS's Reply

First, in response to Ms. Ferrante's assertion that "it is undisputed that Ferrante filed a verified administrative complaint under oath alleging that she had been the victim of sex discrimination", MAS states that Ms. Ferrante "never filed a charge 'under oath' with the MHRC". *Def.'s Reply* at 1. MAS notes that the Maine Human Rights Act provides that an "aggrieved person . . . may file a complaint under

oath with the commission" and that Maine Human Rights Commission regulations provide that "[c]omplaints must be sworn to under oath before a Notary Public or other person authorized by law to administer oaths, or before a representative of the EEOC and HUD . . . ." *Id.* at 1; *see* 5 M.R.S. § 4611; Me. Human Rights Comm'n R. 2.02(E). MAS then points to Ms. Ferrante's July 26, 2011 charge, stating that although Ms. Ferrante "appears to have signed in the place on the form where she 'swears' that the charge is true, there is no signature from a notary or other authorized person on the form." *Def.'s Reply* at 2. MAS argues that Ms. Ferrante cannot cure this omission because the MHRC already dismissed her complaint, and thus Ms. Ferrante has not administratively exhausted her MHRA claims, is not entitled to any damages provided for in 5 M.R.S. § 4613, is not entitled to injunctive relief, and can recover no remedies under the MHRA. *Id.*

Next, MAS insists that the Court cannot consider any retaliatory action that occurred after July 26, 2011 because Ms. Ferrante never amended her charge, "thereby denying MAS an opportunity to address before the EEOC her allegations of ostracism and elimination of job duties." *Id.* at 5. MAS insists that Ms. Ferrante's reliance on *Clockedile* is misplaced, and that even if the Court accepts the "relaxed standard" set forth in *Clockedile*, the Court could still not consider activity after July 26, 2011 because of the "dissimilar nature of the allegations in the charge versus the allegations brought later". *Id.* (citing *Clockedile*, 245 F.3d at 6). MAS maintains that it took prompt steps to ensure that Ms. Wing "would never bother [Ms. Ferrante]

again", and that Ms. Ferrante's current claim is "so distinct from her original charge that it cannot be said to have 'arisen out of the original' complaint".  *Id.*

Finally, MAS maintains that Ms. Ferrante did not experience an adverse employment action, points to Ms. Ferrante's MFRs as evidence that "no reasonable person could conclude that MAS subjected [Ms. Ferrante] to an adverse employment action" and disputes that Ms. Ferrante was ostracized or stripped of her job responsibilities.  *Id.* at 6-7.  MAS concludes by arguing that even if the retaliation was causally connected to the adverse employment action, that alone is insufficient to generate a genuine issue of material fact.  *Id.* at 7.

## C.    Count III:  Constructive Discharge

### 1.    MAS's Motion

MAS argues that Ms. Ferrante's constructive discharge claim fails as a matter of law because the Maine Law Court has held that constructive discharge is not an independent cause of action.  *Id.* at 20 (citing *Levesque v. Androscoggin Cnty.*, 2012 ME 114, ¶¶ 8-9, 56 A.3d 1227, 1229).

### 2.    Ms. Ferrante's Opposition

Ms. Ferrante maintains that "the claims for sexual harassment and retaliation are not subject to summary judgment, and thus neither is the claim for constructive discharge".  *Pl.'s Opp'n* at 20.

## D.    Failure to Exhaust Administrative Remedies

Ms. Ferrante stated in her opposition brief that she filed a "verified administrative complaint under oath".  *Id.* at 14.  MAS pounced on this, contending

that because Ms. Ferrante's July 26, 2011 charge does not contain a signature from a notary or other authorized person, the complaint does not satisfy the "under oath" requirements of the MHRC Rules and Regulations, and thus that Ms. Ferrante never administratively exhausted her claims under the MHRA, making her claims moot. *Def.'s Reply* at 2.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed

claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## B.    Failure to Exhaust Administrative Remedies

To place MAS's position in context, on July 26, 2011, Ms. Ferrante filed a single Charge of Discrimination with both the EEOC and the MHRC. *Def.'s Reply* Attach. 2, *Charge of Discrimination* (*Ferrante Charge*). In the charge Ms. Ferrante sets forth three paragraphs, the first describing the events underlying her charge, the second stating that she was holding the supervisor as responsible for the actions occurring within the office that made it a hostile work environment, and the third alleging that she had been discriminated against because of her sex/gender and sexually harassed. *Id.* at 1. The form contains the following affirmation on the bottom left:

I declare under penalty of perjury that the above is true and correct.

*Id.* Ms. Ferrante signed that declaration and dated it July 26, 2011. *Id.*

To the right of this declaration is a box that says: "NOTARY – When necessary for State and Local Agency Requirements." *Id.* The affirmation reads:

> I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

*Id.* The signature line above this affirmance is blank. *Id.* In the place where a notary public would place the seal, confirming that Ms. Ferrante had subscribed and sworn to the statement, Ms. Ferrante's signature appears, but there is no signature or seal of a notary public. *Id.*

First, the Court observes that Ms. Ferrante's charge would meet the verification requirements of federal law. Under 42 U.S.C. § 2000e-5(b), Title VII mandates that a charge be "in writing under oath or affirmation" and EEOC regulations require that a charge "shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9. The EEOC regulations define "verified" to mean "sworn to or affirmed before a notary public, designated representative of the [EEOC] or other person duly authorized by law . . . , or supported by an unsworn declaration in writing under penalty of perjury." 29 C.F.R. § 1601.3. Federal law further provides that, with some unrelated exceptions, whenever a federal law requires a "sworn declaration, verification, certificate, statement, oath or affidavit, in writing of the person making the same (other than a deposition, or oath of office, or an oath required to be taken before a specified official <u>other than a notary public</u>)", an unsworn declaration under penalty of perjury satisfies this requirement. 28 U.S.C. § 1746 (emphasis supplied). Federal courts have held that an unsworn declaration under penalty of perjury, such as the one Ms. Ferrante executed, satisfies the verification requirement. *See Green v. Liberty Healthcare Sys., LLC*, No. 10-0413, 2010 U.S. Dist. LEXIS 105481, at *9-10 (W.D. La. Oct. 1, 2010); *Cobb v. Marshall*, 481 F. Supp. 2d

1248, 1256 (M.D. Ala. 2007); *Fultz v. B.A. Mullican & Mfg. Co.*, 197 F. Supp. 2d 523, 525 (W.D. Va. 2002) ("Fultz complied with the statute by signing and dating the charge underneath the perjury language, again as prescribed").

However, MAS observes that, even though Ms. Ferrante initiated a Title VII claim, she decided not to pursue a federal theory of action and instead decided to proceed only under the MHRA. The MHRA provides:

> Any aggrieved person . . . may file a complaint under oath with the commission stating the facts concerning the alleged discrimination . . . .

5 M.R.S. § 4611. In the Court's view, Ms. Ferrante's declaration meets Maine's statutory requirement. If false, even without a notary public swearing, Ms. Ferrante's declaration under penalty of perjury would likely provide a basis for a criminal prosecution under 17-A M.R.S. § 451 or § 452 for perjury or false swearing.

Nevertheless, MAS contends that Ms. Ferrante's sworn declaration does not comply with the regulatory requirement of MHRC rules:

> Complaints must be sworn to under oath before a Notary Public or other person authorized by law to administer oaths, or before a representative of the EEOC and HUD pursuant to work sharing agreements signed between the Commission and the EEOC . . . . Commission staff will reduce the information to writing on the appropriate complaint form and send it to the aggrieved party to be notarized and filed with the Commission.

Me. Human Rights Comm'n R. 2.02(E). MAS demands that the entire complaint be dismissed for failure to comply with this provision.

The Court disagrees. Even though Ms. Ferrante technically violated the MHRC rule—as opposed to the statute—by failing to have her charge notarized, the question remains what remedy should be imposed as a consequence of the violation.

MAS cited no case addressing this issue in Maine and no case in which a court has dismissed a case where an aggrieved person declared the truth of the facts under penalty of perjury but neglected to have the statement sworn before a notary. Here, where Ms. Ferrante substantially complied with the "under oath" requirement, the Court will not infer that the failure to swear to the truth of the claim mandates the draconian remedy of dismissal. To the contrary, the Court concludes that equitable defenses are available to this omission and that, applying those equitable defenses, MAS has waived this issue and has demonstrated no prejudice from the omission. Accordingly the Court declines to sanction Ms. Ferrante for the omission.

First, the Court observes that the statement that MAS wants notarized is less assertive than Ms. Ferrante's sworn declaration. The statement that MAS wishes notarized reads:

> I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

*Ferrante Charge* at 1. By contrast, Ms. Ferrante declared under penalty of perjury that the facts in her claim were "true"—with no "best of my knowledge, information and belief" equivocation. *Id.* The sworn declaration of truth is more meaningful than the notarized swearing of truth to the best of knowledge, information and belief.

MAS argues that *Merchant v. Prince George's County*, 948 F. Supp. 2d 515, 523 (D. Md. May 31, 2013) addresses a similar situation. *Def.'s Reply* at 2, n.3. It does not. In *Merchant*, the claimant "never filed a verified, formal charge of discrimination with the EEOC." *Merchant*, 948 F. Supp. 2d at 520. Instead, she claimed that an intake questionnaire satisfied the verification requirement, but the *Merchant* Court

concluded that an intake questionnaire does not meet the verification requirement. *Id.* at 519-24. The same is true of *Frank v. L.L. Bean, Inc.*, where the employee submitted to the MHRC only a completed intake questionnaire, not "a verified charge (sworn or attested to under penalty of perjury)" until after the limitations period had run. *Frank v. L.L. Bean, Inc.*, 2006 U.S. Dist. LEXIS 867, at *29-30.

MAS cites other federal cases that it claims reached the conclusion that the court enforced the verified charge requirement. *See Def.'s Reply* at 2, n.3. However, in each of the cited cases the claimant filed no verified statement at all. *See Id.* at 2, n.3 (citing *Balazs v. Liebenthal*, 32 F.3d 151, 156 (4th Cir. 1994) ("the filing of a sworn charge of discrimination with the EEOC is a mandatory prerequisite to the validity of the charge")); *Danley v. Book of the Month Club, Inc.*, 921 F. Supp. 1352, 1354 (M.D. Pa. 1996) (employee sent the EEOC an unsworn letter). As the Court noted earlier, Ms. Ferrante's declaration under penalty of perjury would have met the verification requirement under federal law and MAS's cited cases do not stand for a different proposition.

Turning to the MHRA, the Maine Supreme Judicial Court has reiterated that it looks to federal law in general in interpreting the provisions of the MHRA, *Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶ 15, 914 A.2d 1116, and the United States Supreme Court has ruled that the Title VII time limits are not jurisdictional. *See Union Pac. R.R. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 82 (2009) (describing the timely complaint requirement in Title VII cases as "nonjurisdictional and forfeitable"); *Zipes v. Trans*

*World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  In fact, the First Circuit cited *Zipes* in emphasizing that "the exhaustion requirement is not a jurisdictional prerequisite, but rather is subject to waiver, estoppel, and equitable tolling."  *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 33 (1st Cir. 2007) (citing *Zipes*, 455 U.S. at 393).  The verification requirement appears to fall within the same rubric.  *See Maillet v. TD Bank US Holding Co.*, 981 F. Supp. 2d 97, 102 n.6 (D. Mass. 2013) ("The Supreme Court reasoned that EEOC time limits on administrative filings were not jurisdictional because the Title VII jurisdiction provision did not mention time limits, which, <u>like the verification requirement</u>, appeared instead 'as an entirely separate provision' and did 'not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts'") (emphasis supplied).

This means that MAS's claim of non-compliance is subject to waiver.  Here, the Court concludes that MAS waived any claim that Ms. Ferrante failed to comply with the verification requirement under Maine law in filing her MHRC complaint.  Ms. Ferrante filed the charge with the MHRC in late July, 2011 and MAS waited until July 2014, in a reply memorandum, to raise the issue.[96]  MAS is too late.  *EEOC v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 639 (N.D. Ill. 1988) ("[E]ven if § 1746 does require a dated signature, WFC has waived this argument by not raising it until two years after it received the Charge").  Had MAS raised the issue when Ms.

---

[96]     MAS mentioned the oath requirement in its original memorandum.  *Def.'s Mot.* at 10-11.  But it was in the context of whether the intake questionnaire, which was not signed under oath, would be considered a charge of discrimination.  *Id.* at 11.  MAS did not raise Ms. Ferrante's failure to have the EEOC charge notarized until its reply.  *Def.'s Reply* at 1-2.

Ferrante first filed the charge, she could have readily cured the defect by submitting a notarized affidavit.

Next, to the extent the policy underlying the oath requirement is to deter false and frivolous claims by forcing the aggrieved party to make the charge under oath, this policy has been satisfied by Ms. Ferrante's sworn declaration. MAS has claimed no prejudice resulting from the failure of Ms. Ferrante to swear to the contents of the charge before a notary public and the Court can fathom none. Indeed, if MAS were concerned that Ms. Ferrante failed to affirm the facts underlying her charge under oath before a Notary Public, it cured that concern on September 21, 2012 when its counsel deposed Ms. Ferrante under oath from 10:15 a.m. to 5:26 p.m., *Ferrante Dep.* 1:12-16, 206:17, a deposition where Ms. Ferrante was "duly sworn by the Notary Public", *id.* at 5:5-6, and runs 206 pages in length. *Id.*

The Court declines to dismiss Ms. Ferrante's MHRA complaint based on MAS's late raising of a technical flaw in her charge under MHRC regulations.

## C. Count I: Sexual Harassment based on a Hostile Work Environment

The MHRA prohibits employers from discriminating against an employee "because of race or color, sex, sexual orientation, physical or mental disability, religion, age, ancestry or national origin . . . ." 5 M.R.S. § 4572. To succeed on an employment-related claim of sexual harassment based on a hostile work environment, a plaintiff must establish:

(1) That she (or he) is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or

pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so; and (6) that some basis for employer liability has been established.

*Watt*, 2009 ME 47 ¶, 22, 969 A.2d 897 (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 228 n. 1 (1st Cir. 2007)). "Application of the hostile work environment test requires an assessment of the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[97] *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 33 (1993)). Although harassment that occurred on only one occasion may be actionable, "the inappropriate conduct must be severe enough to cause the workplace to become hostile or abusive." *Doyle v. Dep't of Human Servs.*, 2003 ME 61 ¶, 23, 824 A.2d 48 (citing *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976 (Me. 1996)). Nevertheless, the elements of the test are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. 775, 788 (1998) (quoting *Oncale*, 523 U.S. at 81).

Ms. Ferrante contends that Ms. Wing created a hostile work environment by continuously commenting on women's and men's bodies or discussing topics of a

---

[97]     "Maine courts have relied on federal case law surrounding Title VII for the purpose of construing and applying the provisions of the MHRA." *Paquin v. MBNA Mktg. Sys., Inc.*, 233 F. Supp. 2d 58, 64 (D. Me. 2002) (citing *Bowen*, 606 A.2d 1051 (Me. 1992)); *see also Watt*, 2009 ME 47 ¶ 22, 969 A.2d 897. Accordingly, the Court finds that the legal analysis applicable to Title VII sex discrimination claims applies with equal force to Ms. Ferrante's MHRA claims.

sexually explicit nature on a daily basis for a period of over two months, and which continued despite Ms. Ferrante asking Ms. Wing to stop. MAS does not admit that Ms. Wing made each of the statements alleged by Ms. Ferrante, but the Court credits Ms. Ferrante's version of the events for the purposes of summary judgment. Specifically, MAS contests elements (3), (4), and (6) of Ms. Ferrante's claim. The Court examines each element in turn.

### 1. Whether Ms. Wing's Harassment Was Based Upon Ms. Ferrante's Sex

In *Oncale v. Sundowner*, the Supreme Court set the standard for determining employer liability in same-sex hostile work environment claims, and stressed that such claims under Title VII are actionable as long as the "*discrimination* [was] . . . because of . . . sex." *Oncale* 523 U.S. at 80 (emphasis in original). The Court stated, "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words have used sexual content or connotations."[98] *Id.* at 80. Instead, the critical issue "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80. The Court offered three potential evidentiary paths by which a same-sex plaintiff may show the

---

[98] Ms. Ferrante insists that "Ms. Wing's offensive sexual comments did amount to harassment based upon sex given the use of sex-specific language directed in the presence of Ms. Ferrante and with the knowledge that such behavior created a hostile environment for Ms. Ferrante". *Pl.'s Opp'n* at 11. However, her argument does not survive under *Oncale*. The Supreme Court has made it clear that comments of a sexual nature alone are insufficient unless additional context provides an inference that the discrimination is sex based. "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" *Oncale*, 523 U.S. at 80–81 (citations omitted). Ms. Ferrante's assertion, unsupported by any case law, is insufficient to show that Ms. Wing's behavior was directed at Ms. Ferrante "because of sex."

conduct was based on or because of sex: (1) where the harassment was "motivated by sexual desire"; (2) where the victim is "harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by a general hostility to the presence of women in the workplace"; and (3) direct comparative evidence about how the harasser treated "members of both sexes in a mixed-sex workplace." *Id.* at 80.

In this case, Ms. Ferrante has not alleged that Ms. Wing was motivated by a sexual desire toward Ms. Ferrante. Nor has Ms. Ferrante presented evidence or argued that Ms. Wing was motivated by a general hostility to the presence of women in the workplace. The dispute between the parties is over whether Ms. Ferrante has provided sufficient direct comparative evidence to satisfy the third evidentiary path laid out by the Supreme Court.

MAS asserts that Ms. Ferrante has presented no evidence to support the conclusion that Ms. Wing treated men and women differently. *Def.'s Mot.* at 4-5. MAS also contends that the all-female workplace prevents Ms. Ferrante from offering direct comparative evidence to support her claim. *Id.* at 5. Ms. Ferrante argues that she has at least generated a triable issue of material fact as to "whether Ms. Wing made the sexually offensive comments to all different groups of people" because Ms. Ferrante has presented evidence that Ms. Wing "only made the offensive sexual comments in the presence of women." *Pl.'s Opp'n* at 11.

Ms. Ferrante has not cited, nor has the Court been able to locate, case law that addresses sexual harassment claims in entirely same-sex workplaces where the

plaintiff has not alleged that the harasser is motivated by sexual desire or by a general hostility to the presence of those of her sex in the workplace, nor has she provided direct evidence about how the alleged harasser treated men and women differently.[99]  The Court concludes that Ms. Ferrante has failed to meet her burden because she has neither offered nor alleged any direct comparative evidence about how Ms. Wing treated men and women differently.  Although the Court certainly does not believe that Ms. Wing's comments and behavior constitute "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex", *see Oncale* at 81, Ms. Ferrante has failed to show that the comments, while vulgar and offensive, were directed at her because of her sex.  Therefore, MAS is entitled to summary judgment as regards Ms. Ferrante's harassment claim.

### D.    Count II:  Retaliation Claim

The MHRA prohibits retaliation whenever an "individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the MHRA]." 5 M.R.S. § 4633(1).  Where there is no direct evidence of the defendant's retaliatory animus, courts rely on the *McDonnell Douglas* burden-shifting framework to allocate and order the parties' evidentiary

---

[99]     This does not mean that single-sex work places are immune from claims under the MHRA, only that the third prong requires differential treatment between "members of both sexes in a mixed-sex workplace." *Oncale* at 80.  It may be theoretically possible to make a successful claim under the third prong in a single-sex workplace.  If so, this is not the case.  In 2011, only two men worked at the MAS Westbrook office and as of July 8, 2011, only one man, Duane Manning, worked at that office. DSMF ¶¶ 25, 26; PRDSMF ¶¶ 25, 26.  Mr. Manning's office was on the opposite end of the office from where Ms. Ferrante, Ms. Wing, and Ms. Proulx worked.  DSMF ¶ 27; PRDSMF ¶ 27.  Ms. Ferrante has neither offered nor alleged evidence regarding how Ms. Wing behaved toward Mr. Manning.

burdens. *Dudley v. Augusta Sch. Dep't,* 23 F. Supp. 2d 85, 92 (D. Me. Nov. 9, 1998). "To establish a prima facie case of retaliation, the employee must show that she engaged in statutorily protected activity; her employer made an employment decision that adversely affected her; and that 'there was a causal link between the protected activity and the adverse employment action.'"[100] *Doyle,* 2003 ME 61, ¶ 20, 824 A.2d 48 (quoting *Bard v. Bath Iron Works Corp.,* 590 A.2d 152, 154 (Me. 1991)).

If the employee establishes a causal link by showing that the adverse employment action happened in "close proximity" to the protected conduct, the burden shifts to the employer "to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action." *DiCentes v. Michaud,* 1998 ME 227, ¶¶ 14-16, 719 A.2d 509. "Once that evidence has been offered, the burden remains with the employee to persuade the factfinder that there was, in fact, a causal connection between the protected activity and the adverse employment action." *Id.*; *see also Watt,* 2009 ME 47 ¶ 35, 969 A.2d 897 ("Because [the employer] has articulated a legitimate reason for the action, the burden remains with [the plaintiff] to persuade the fact-finder that there was, in fact, a causal connection between the protected activity and the adverse employment action." (quotation omitted)).

### 1. Timeliness of Ms. Ferrante's Charge

---

[100]     "The First Circuit has ruled that establishing a prima facie case of retaliation is a 'relatively light burden.'" *Ramsdell v. Huhtamaki, Inc.,* 992 F. Supp. 2d 1, 15 (D. Me. Jan. 15, 2014) (quoting *Mariani–Colon v. Dep't of Homeland Sec.,* 511 F.3d 216, 224 (1st Cir.2007)). The plaintiff "need only show that she had a reasonable belief that the conduct complained of amounted to an unlawful employment practice . . . and need not prevail on the underlying claim." *Bowen,* 606 A.2d 1051 (Me. 1992).

Under both Title VII and the Maine Human Rights Act, a timely claim of retaliation must be filed not more than 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e–5(e)(1); 5 M.R.S. § 4611. As the Supreme Court explained, "[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Morgan*, 536 U.S. at 117.

The undisputed facts here establish that Ms. Ferrante filed a charge of discrimination on July 26, 2011. The Court concludes that Ms. Ferrante filed a timely claim because the adverse actions complained of occurred within 300 days of filing her charge.

Next, the Court addresses whether it can consider facts related to a retaliation claim not made to the MHRC. The First Circuit has stated:

> A claim of retaliation for filing an administrative charge with the EEOC is one of the narrow exceptions to the normal rule of exhaustion of administrative remedies. Such a claim may ordinarily be bootstrapped onto the other Title VII claim or claims arising out of the administrative charge and considered by the district court, even though it has not been put through the administrative process. This is so because such a claim of retaliation is "reasonably related to and grows out of the discrimination complained of to the [EEOC]." In other words, the retaliation claim survives what would otherwise be a failure to exhaust administrative remedies by virtue of its close relation to and origins in the other Title VII discrimination claims.

*Franceschi v. U.S. Dept. of Veterans Affairs*, 514 F.3d 81, 86-87 (1st Cir. 2008) (quoting *Clockedile*, 245 F.3d at 6) (internal citations omitted).

MAS leans heavily on the Supreme Court's decision in *Morgan*, arguing that Ms. Ferrante's charge alleged only one discrete act of retaliation – the comment by Ms. Wing that Ms. Ferrante was doing her job incorrectly – and that MAS's actions after July 26, 2011 should not be considered because they were not included in Ms. Ferrante's July 26 charge and are dissimilar in nature from the only act of retaliation she alleged. *Def.'s Mot.* at 11-13.

Ms. Ferrante responds that *Morgan* is inapplicable and that the First Circuit has unequivocally held that retaliatory adverse employment actions arising out of the original discrimination complaint and occurring after the initial agency filing do not have to be exhausted. *Pl.'s Opp'n* at 16-17 (citing *Clockedile*, 245 F.3d at 6).

MAS responds that *Clockedile* is inapplicable, and that even if it applied to this case that the "dissimilar nature of the allegations in the charge" compared to the allegations brought later is insufficient to demonstrate that the retaliation claim can reasonably be seen as having "arisen out of the original" charge. *Def.'s Reply* at 5-6.

The allegations in Ms. Ferrante's charge included: (1) her supervisor made comments regarding sex with her husband in front of Ms. Ferrante and others, comments which she continued after Ms. Ferrante told her she should stop; (2) Ms. Ferrante met with human resources on or around June 28, 2011 to voice opposition to what she felt was a "pervasive and unprofessional work environment"; (3) her supervisor questioned her about her meeting with human resources and told her not to go to human resources under any circumstances without informing her first; (4) a meeting on June 29, 2011 held by her supervisor where she said that she "would not

be going anywhere"; (5) her supervisor told her on July 1, 2011 that her work was being done incorrectly; (6) Ms. Ferrante requested and received a transfer to a different department; (7) Ms. Ferrante had a meeting with a vice president of the company who apologized for her supervisor's behavior; (8) her supervisor made the office a hostile work environment; and (9) she believed that she had been discriminated against because of her sex and sexually harassed. *See Ferrante Charge*.

In the Court's view, MAS's argument that Ms. Ferrante failed to exhaust her administrative remedies is misplaced.[101]  It is undisputed that Ms. Ferrante did not expressly invoke the MHRA's anti-retaliation provision in her charge, nor do the parties dispute that she did not seek to file an amended charge.  However, Ms. Ferrante checked the "Retaliation" box on the charge form, and expressly alleged retaliatory conduct – her supervisor's comment that her work was being done incorrectly – in the body of the charge.

The acts by MAS's agents and employees after July 26, 2011 that Ms. Ferrante complains of, among other things, are: pressure from MAS management to withdraw her charge, being told via email by a vice president at the company that the charge was "completely baseless and reckless", being ostracized by her coworkers, seeing a coworker terminated for speaking on her behalf, and having her job duties removed. When viewed in their totality, the Court concludes, these actions are reasonably

---

[101]     MAS's reliance on *Morgan* is likewise misplaced.  *Morgan* is distinguishable because the plaintiff in that case filed a charge with the EEOC, complaining of discriminatory acts, some of which occurred more than 300 days before the charge was filed.  *See Morgan,* 536 U.S. at 106.  Ms. Ferrante filed her charge when she had been working for MAS for less than 90 days.  Whether conduct should be considered when it happened outside of the statutory 300-day look back window is not at issue in this case.

related to Ms. Ferrante's charge. *See Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 21-22 & n.7 (1st Cir. 2014) (finding that the same factual allegations that formed the basis of plaintiff's discrimination claim also supported her claim that the employer retaliated against her because she filed a sex discrimination EEOC charge).

Having determined that Ms. Ferrante's claims are timely and encompass conduct occurring both before and after she filed her charge, the Court analyzes each of the elements in Ms. Ferrante's prima facie retaliation claim.

### 2. The Prima Facie Case

#### i. Whether Ms. Ferrante Engaged in Statutorily Protected Activity

"An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice' by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir.1996)) (internal quotations omitted). "[I]n determining whether conduct is protected opposition—the first step, a court must balance the setting in which the activity arises and the interests and motivations of both employer and employee." *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 232 (1st Cir. 1976); *cf. Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003) ("[T]he employment activity or practice that [plaintiff] opposed need not be a Title VII violation so long as [plaintiff] had a reasonable belief that it was, and [s]he communicated that belief to

[her] employer in good faith"). "Protected conduct includes not only the filing of administrative complaints, but also complaining to one's supervisors." *Valentin-Almeyda*, 447 F.3d at 94 (internal citation omitted) (citing *Benoit*, 331 F.3d at 175).

Ms. Ferrante filed her charge on July 26, 2011, and MAS received notice of that charge on August 8, 2011.[102] MAS argues only that the complaint was not "protected activity" because Ms. Ferrante "at no time . . . mention[ed] any facts that could reasonably lead Ms. Joy or anyone else at MAS to believe that [Ms. Ferrante] was complaining about a 'sexually' hostile work environment. *Def.'s Mot.* at 15. MAS asserts that it had no notice of potentially unlawful sexual conduct, and argues that the July 26 complaint is therefore not protected activity. *Id.* at 15.

The parties do not dispute that Ms. Ferrante met with Ms. Joy on June 28 or 29 to discuss concerns she had about Ms. Wing and that she filed a charge on July 26. Although the Court concludes that Ms. Ferrante's sex discrimination charge does not survive summary judgment, it nevertheless determines that Ms. Ferrante had at least a reasonable belief that she was subjected to unlawful sex-based discrimination and retaliation. Ms. Ferrante has offered evidence that Ms. Wing made embarrassing sexual remarks to or in front of Ms. Ferrante on a daily basis for approximately two months, and sometimes in the presence of Ms. Ferrante's coworkers. Ms. Wing continued the comments after Ms. Ferrante asked her to stop. Ms. Ferrante's deposition testimony and memoranda, along with other record evidence, reveal that

---

[102]     MAS argued that Ms. Ferrante's complaint was not "under oath" as required by the MHRA; the Court addressed that issue in Part III B of this Order. MAS does not further deny that Ms. Ferrante filed a charge with the MHRC.

Ms. Wing's harassment caused Ms. Ferrante to suffer psychologically and emotionally. She requested leave to go home early on December 2, 2011, citing "workplace harassment."[103] Additionally, her resignation letter on December 5, 2011 cited harassment and retaliation as causes for leaving her job. *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 48 (1st Cir. 2010) ("This is not a case in which the challenged conduct amounted to a single, mild incident or offhand comment, such that no reasonable person could have believed that this conduct violated Title VII.").

Finally, even though MAS properly cites *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 138 (1st Cir. 2013), for the proposition that the First Circuit has required an employee to put the employer on notice of the sexual nature of the harassment, *Def.'s Mot.* at 14, there is a genuine dispute between the parties regarding whether Ms. Ferrante told Ms. Joy about the sexual nature of Ms. Wing's conduct in their meeting. Accordingly, the Court may not conclude as a matter of law that MAS had no notice of the sexual harassment. Regardless, Ms. Ferrante checked the "Retaliation" box in her charge and had a good faith, reasonable belief that the actions of her employer violated the law. A jury could find that it was not unreasonable to believe that Ms. Wing's conduct amounted to sexual harassment. Therefore, the Court finds that Ms. Ferrante met her burden of demonstrating that she engaged in protected activity.

### ii. Whether Ms. Ferrante Suffered an Adverse Employment Action

---

[103] Ms. Ferrante assumes that everything that happened to her even after she was transferred to the Director's Assistant position under Ms. Proulx constituted ongoing sexual harassment. However, the incidents of which she complains after mid-July 2011 are potentially retaliatory, but not sexual harassment. In other words, if Ms. Ferrante's complaints, like the silent treatment, not being invited to meetings, or a lessening of job duties, had been the sole basis for her sexual harassment claim, these incidents would be a thin reed to establish a sexual harassment case, as opposed to a retaliation case.

To satisfy the second element of a prima facie MHRA retaliation claim, the employment action taken must be "materially adverse" such that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In Maine, constructive discharge can satisfy this element, as it can in MHRA discrimination claims (*see Levesque*, 2012 ME 114, ¶ 8, 56 A. 3d 1227 ("In Maine, a plaintiff may use the doctrine of constructive discharge to satisfy the elements of "discharge" or "adverse employment action" in an otherwise actionable claim pursuant to section 4572 of the Maine Human Rights Act.")). First Circuit case law also provides that although a typical adverse employment action "involves a discrete change in the terms and conditions of employment (say, a discharge, demotion, or reduction in pay)", "workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Noviello v. City of Boston*, 398 F.3d 76, 88, 89 (1st Cir. 2005). Although the Law Court has not specifically addressed whether a retaliatory hostile work environment can serve as an adverse employment action where the plaintiff was constructively discharged, a recent decision in this District suggests that the theory is viable. *See Ramsdell v. Huhtamaki*, 992 F. Supp. 2d 1, 18 (D. Me. Jan. 15, 2014) (applying retaliatory hostile work environment analysis in context of constructive discharge claim).

MAS argues that its managers' and employees' conduct fails to qualify as an adverse employment action as a matter of law. MAS contends that "attempting to

discuss [Ms. Ferrante's] EEOC charge with her" is not retaliatory, and that Ms. Ferrante "only imagined" that MAS representatives pressured her to withdraw her charge. *Def.'s Mot*. at 16. Next, MAS argues that "shunning, ostracism or unpleasant treatment by coworkers in and of itself is not an adverse action." *Id.* at 17. Further, MAS argues that the "evolution" of Ms. Ferrante's job responsibilities was likewise not retaliatory. *Id.* MAS maintains that her position was "brand-new in a company that was quickly growing" and that changes to Ms. Ferrante's job duties were the "product of an evolving business." *Id.* at 17-18. Moreover, MAS asserts, Ms. Ferrante alleges that job responsibilities were taken from her, but has presented "no evidence that she previously performed any of the job duties at issue . . . ." *Id.* at 18. MAS acknowledges that Ms. Ferrante can show that the Fall 2011 audit was reassigned, but maintains that task "cannot in and of itself serve as a form of adverse action as it did not change any of the conditions of her employment, result in a pay decrease, demotion, or any other action." *Id.* Finally, MAS asserts that Ms. Ferrante's allegations in sum do not rise to the level of a hostile work environment culminating in constructive discharge. *Id.*

Ms. Ferrante remains steadfast in her conviction that MAS retaliated against her. She states that reassignment of duties in and of itself can be considered a materially adverse employment action. *Pl.'s Opp'n* at 15. With respect to her former coworkers' and supervisors' conduct, she states that rudeness and ostracism, when considered collectively with other retaliatory actions, can rise to the level of an

adverse employment action. *Id.* The totality of the adverse actions taken against her, she maintains, amount to "overwhelming evidence" of adverse actions. *Id.*

Ms. Ferrante has offered evidence of the following alleged retaliatory acts:

(1) On June 29, either the same day or the day after Ms. Ferrante first complained to human resources, her supervisor told her she was doing her job incorrectly.

(2) On August 17 and 18 of 2011, Ms. Ferrante's supervisor and a human resources representative met with her to discuss her charge, and Ms. Ferrante felt in both meetings that they were pressuring her to withdraw her charge.

(3) On August 17, MAS began to reduce Ms. Ferrante's responsibilities.

(4) After August 17, Ms. Ferrante believes she did not get adequate training on six tasks in her job description.

(5) On August 19, Mr. Johnson sent an email to human resources and copied Ms. Ferrante, documenting his investigative findings and saying that the charge was "completely baseless and reckless" and he felt Ms. Ferrante should "withdraw the charge immediately."

(6) On August 22, a coworker who overheard Ms. Ferrante's supervisor and a human resources representative "make a vigorous attempt" to compel Ms. Ferrante to withdraw her charge was laid off.

(7)     On September 1, MAS posted a help wanted ad for an administrative assistant who would report to Ms. Ferrante's supervisor.

(8)     Ms. Ferrante felt that Ms. McLain, who was hired as the administrative assistant, had overlapping responsibilities.

(9)     Starting in mid-August, some of Ms. Ferrante's responsibilities were taken away and given to other employees, and Ms. Ferrante's job responsibilities changed significantly after Ms. McLain was hired in September, despite the fact that she did not receive a memo regarding a change in her job description.

(10)    In October, Ms. Ferrante's supervisor asked Ms. McLain and another MAS employee to perform a quarterly audit, which Ms. Ferrante had done in the past.

(11)    On October 26, Ms. Ferrante submitted a leave request to her supervisor, and on October 31, her supervisor sent an email to MAS staff listing employees with approved leave; Ms. Ferrante's name was not on the list.

(12)    On November 2, Ms. Ferrante's supervisor gave Ms. McLain a list of tasks to complete while she was on vacation, tasks which had previously been Ms. Ferrante's responsibility.

(13)    Ms. Ferrante's supervisor warned at least one of Ms. Ferrante's coworkers that she was not allowed to talk to Ms. Ferrante. That

coworker faced opposition from management after she continued to have contact with Ms. Ferrante.

(14)    On November 8, Ms. Ferrante entered her supervisor's office, where her supervisor and coworker were seated; neither acknowledged her presence.

(15)    On November 14, Ms. Ferrante's supervisor asked her to bring in her keys so that Ms. McLain could also use them.

(16)    On November 16, Ms. Ferrante's supervisor blamed Ms. Ferrante for misfiling charts.

(17)    On November 28, everyone in the office ate together but did not invite Ms. Ferrante.

(18)    Ms. Ferrante was not involved in planning a holiday party for the office, which she believed was one of her responsibilities.

(19)    On November 29, Ms. Ferrante's name was omitted from the staff roster.

(20)    On November 30, Ms. Ferrante was not included in a Section 28 supervisor's meeting that she believed she was supposed to attend.

(21)    On December 1, Ms. Ferrante's supervisor circulated a staff roster, and Ms. Ferrante's name was omitted. She circulated an updated roster shortly thereafter and Ms. Ferrante's name was omitted from that one as well.

Viewed in the light most favorable to Ms. Ferrante, the sum of these actions is sufficient to deny MAS summary judgment on the issue of adverse employment action. Ms. Ferrante has presented evidence that after MAS received notice of her charge alleging sex discrimination and retaliation, MAS management told her coworkers not to talk to her, that she was subject to unwarranted reprimands, was pressured by management to withdraw her charge, had many of her job responsibilities taken away, was left off of staff rosters, which could be an implication or threat of being terminated, and made a request for leave that was ignored. This is sufficient to deter a reasonable worker from supporting a charge of discrimination.

MAS hangs its hat on the fact that it transferred Ms. Ferrante into a new role with a new supervisor and a higher pay rate. However, for purposes of MAS's motion for summary judgment, this is insufficient to counterbalance the numerous other actions MAS management took against Ms. Ferrante within two weeks of discovering that she had filed an EEOC charge and that she was not planning to withdraw it. The Court concludes that the evidence in this case, viewed in the light most favorable to Ms. Ferrante, would allow, but not compel a reasonable jury to find that Ms. Ferrante was subjected to a retaliatory hostile work environment.

### iii. Whether the Adverse Employment Action Happened in Close Proximity to the Protected Conduct

To establish the third element of her prima facie case of retaliation under the MHRA, Ms. Ferrante must demonstrate a causal link existed between her protected activity and the adverse employment action. *See Bowen*, 606 A.2d 1051, 1054 (Me. 1992). The Supreme Court has held that "[t]he text, structure, and history of Title

VII demonstrate that a plaintiff making a retaliation claim under [42 U.S.C.] § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ⸺ U.S. ⸺, 133 S. Ct. 2517, 2534 (2013). Regarding that causal link, the Supreme Court has stated that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citation omitted). "Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992). However, the Maine Law Court determined that less than two months is sufficient proximity to satisfy the causal link for the purposes of a prima facie retaliation claim. *Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶16, 58 A.3d 1083.

MAS argues that Ms. Ferrante cannot prove temporal proximity between her protected activity and the adverse employment action because her EEOC charge and subsequent resignation occurred approximately four months apart. *Def.'s Mot.* at 20. Ms. Ferrante argues that she has set forth sufficient evidence that show that she suffered adverse employment action within thirty days of MAS receiving notice of Ms. Ferrante's EEOC charge. *Pl.'s Opp'n* at 19.

The undisputed facts establish that Ms. Ferrante filed her charge on July 26, 2011, and MAS received it by August 9, 2011. There was a steady stream of action taken against Ms. Ferrante starting within two weeks of MAS receiving notice of her charge, which rose to the level of adverse employment action within two months. The Court concludes that Ms. Ferrante suffered adverse employment action in close proximity to her protected conduct.

### 3. The Existence of a Legitimate, Nondiscriminatory Reason for MAS's Conduct

MAS offers only two nondiscriminatory reasons for instances of conduct Ms. Ferrante argues are retaliatory. Specifically, MAS asserts that 1) Ms. Ferrante was not invited to the Section 28 meeting because she was not a Section 28 supervisor, DRPSAMF ¶¶ 75, 88; and 2) Ms. Ferrante was not invited to a MAS Christmas party because the invitation was for "clients and BHP/BHP-RC's so no invitation would go to Ms. Ferrante". DRPSAMF ¶ 81. Regarding the Section 28 meeting, the Court addressed that issue in footnote 68 above and concluded that it is a reasonable inference that Ms. Ferrante thought she should have been included in the meeting and was not invited due to an ongoing pattern of harassment. The same is true of the invitation to the Christmas party.

MAS also explains that the changes to Ms. Ferrante's job duties and responsibilities were the product of a growing business. *Def.'s Mot.* at 15 (citing DSMF ¶ 53). This assertion, however, is not supported by the record. The evidence in the record supports only the fact that Ms. Proulx was authorized to hire Ms. Ferrante because the business was growing and she needed additional support. It

does not provide a legitimate explanation for the reason Ms. Ferrante's job duties changed.

The Court concludes that MAS has not satisfied its burden of presenting evidence of a legitimate, nonretaliatory reason for its conduct. Even if the Court considers MAS's explanations regarding the Section 28 meeting and the Christmas party to be legitimate, nondiscriminatory reasons for its conduct, Ms. Ferrante still has other evidence of retaliatory conduct sufficient to overcome those explanations.

### 4. Whether a Causal Connection Exists Between the Protected Activity and the Adverse Employment Action

Because MAS was unable to establish a legitimate, nonretaliatory reason for its conduct following its discovery of Ms. Ferrante's charge and subsequent indication that she was not going to withdraw her charge, the Court concludes that a causal connection exists between Ms. Ferrante's protected activity and the adverse employment action for purposes of the motion for summary judgment.

Accordingly, the Court denies MAS's motion with respect to Ms. Ferrante's retaliation claim.

### E. Count III: Constructive Discharge Claim

Under Maine law, "discharge" includes a situation in which "the employee has no reasonable alternative to resignation because of intolerable working conditions." *King v. Bangor Fed. Credit Union*, 611 A.2d 80, 82 (Me. 1992). "Constructive discharge" is a theory of relief that enhances the damages a plaintiff may recover when the plaintiff has chosen to resign without actually being terminated by the employer. *See Levesque*, 2012 ME 114, ¶ 8, 56 A.3d 1227. Constructive discharge

can satisfy the element of "discharge" or "adverse employment action" in an otherwise actionable claim pursuant to section 4572 of the MHRA. *See* 5 M.R.S. § 4572; *Levesque*, 2012 ME 114, ¶ 8, 56 A.3d 1227. However, the Maine Law Court has held that "constructive discharge does not exist as an independent cause of action under Maine statutory or common law." *Levesque*, 2012 ME 114, ¶ 8, 56 A.3d 1227. MAS is entitled to summary judgment on Count III.

The Court has concluded that Ms. Ferrante failed to prove her hostile work environment claim; because a constructive discharge is tantamount to an additional element of her prima facie case, Ms. Ferrante cannot establish constructive discharge without first showing that her work environment was hostile. Furthermore, Ms. Ferrante's constructive discharge evidence is insufficient to overcome the summary judgment hurdle. MAS is entitled to summary judgment on Count III but the theory survives in Counts I and II.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part MAS Medical Staffing's Motion for Summary Judgment (ECF No. 38). The Court GRANTS MAS Medical Staffing's Motion for Summary Judgment as to Counts I and III, but DENIES its Motion for Summary Judgment as to Count II.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2015